Bruce H. SHREEVES, Appellant,

v.

UNITED STATES, Appellee.

No. 9233.

District of Columbia Court of Appeals.

Argued June 13, 1978.

Decided Nov. 15, 1978.

 

Robert B. McCaw, Washington, D. C., with whom John H. Pickering, Arthur F. Mathews, Timothy N. Black, and Arthur B. Spitzer, Washington, D. C., appointed by the court, were on the brief, for appellant.

Cheryl M. Long, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., and John A. Terry, Asst. U. S. Atty., Washington, D. C., were on the brief, for appellee.

Before NEWMAN, Chief Judge, FERREN, Associate Judge, and MURPHY, Associate Judge, Superior Court of the District of Columbia.*

* Sitting by designation pursuant to D.C.Code 1973, § 11-707(a).

NEWMAN, Chief Judge:

Appellant was tried by a jury in a bifurcated trial and found guilty of felony murder, second-degree murder, and armed robbery. In the second phase of the trial, the jury rejected his defense of insanity. Appellant raises the following issues on appeal: (1) denial of his Sixth Amendment right to counsel when appellant was interrogated in the D.C. Jail by a Maryland police official without the consent of his attorney; (2) denial of due process by the trial court's failure to order an independent psychiatric examination at a pretrial extradition proceeding; (3) denial of his Sixth Amendment right to a speedy trial; (4) the trial court's failure to suppress (a) evidence seized from appellant's car by Maryland police officials during the course of their investigation into crimes committed by appellant in that state, and (b) an admission made by appellant during a post-arrest interrogation; (5) the trial court's failure to give appellant's requested jury instruction on felony murder; and (6) denial of his Sixth Amendment right to trial by jury as a result of substituting two alternate jurors at the close of the insanity phase of the trial. In Part I we set forth the facts. In Part II we address the issue of whether appellant's right to counsel was violated by the Maryland police official when he interrogated appellant without the presence of or permission of appellant's counsel. In Part III we discuss the issues concerning governmental delay; i. e., failure to order an immediate psychiatric examination at the time of the extradition proceedings and the speedy trial claim. The suppression questions are addressed in Part IV, and the claims of trial court error concerning jury instruction requests and juror substitution are analyzed in Part V. Finding no reversible error, we affirm.

## I. FACTS

At about 7:30 a.m. on January 26, 1973, appellant and Carroll Milburn robbed and killed Charles R. Myles in front of Myles' home in the District of Columbia. Milburn, who pled guilty to a charge of second-degree murder before appellant's trial, was the principal government witness. He testified that appellant and he robbed Myles and that appellant shot and killed him with a .38 caliber revolver.

According to Milburn, appellant and he drove to the District of Columbia from St. Mary's County, Maryland in appellant's 1966 maroon Pontiac during the late afternoon of January 24, 1973. The next day they spent some time shooting target practice with three firearms at appellant's cousin's house in Montgomery County, Maryland. On their way back to the District, appellant and Milburn stopped for dinner at a restaurant. Appellant suggested that they rob Myles, who was known to carry large amounts of cash on his person.

Appellant and Milburn trailed Myles from his liquor store to a restaurant, and at about 1:00 or 2:00 a.m. they drove to Myles' house to await his return. Appellant told Milburn to go into an apartment building directly across the street from Myles' house and to come out when appellant pulled the gun.

Myles arrived at home between 7:00 and 7:30 a.m. Appellant and Milburn left the car, walked up the street to Myles' house, and started to carry out their plan. In the midst of the robbery, Milburn heard several shots and began to run away. Appellant caught up with him and the two fled the scene in appellant's car.

Appellant returned to Maryland and, the following day, January 27, engaged in several additional acts of violence, including killing a building contractor in White Oak, Maryland.[1] That evening appellant shot a St. Mary's County police officer who stopped his car to investigate the Maryland

---

1. It is clear from the briefs and record in this case that government counsel and defense counsel carefully avoided introducing evidence of the contemporaneous Maryland offenses into the merit phase of appellant's trial. We recite the Maryland events in the statement of facts solely in order to clarify factual details which might otherwise not be fully comprehensible.

crimes. Following that incident, the St. Mary's County police posted lookouts for appellant and his maroon Pontiac.

On Sunday, January 28, Deputy Sheriff Donald W. Purdy of the St. Mary's County Police Department was notified that a car registered to appellant and believed to have been involved in two shooting incidents in Maryland had been parked on private land behind a farmers' market in Mechanicsville, Maryland, for approximately seven hours. The farmers' market was approximately three miles from where appellant had last been seen on the previous evening. When Purdy arrived at the location of the car, it began to rain. This impeded taking fingerprints from the exterior of the car. Purdy ordered the car towed to a private garage in Mechanicsville where prints were taken from the exterior and the inside of the car was examined. Rifle ammunition was found on the seat of the car and seized; a revolver holster, a rifle sheath, a pair of binoculars, and a stocking cap found under the front seat were seized. Inside the glove compartment, Purdy found a District of Columbia personal appearance bond and a traffic ticket receipt naming appellant. In addition, the police found a slip of paper on which was written the name "Miles Anderson" and the license number of a vehicle registered to Charles P. Myles, the decedent. No warrant had been sought before the search of the car.

Appellant was arrested by agents of the Federal Bureau of Investigation (FBI) in the District on February 2, 1973, at about 9:40 p.m. He was charged with unlawful flight to avoid prosecution on homicide charges in Maryland. He was advised of his *Miranda*[2] rights at the scene of his arrest and again at the FBI District of Columbia field office. He signed a form indicating that he understood and waived his rights.[3] Although he signed the waiver form and willingly gave the agents routine descriptive data about himself, he refused to answer questions concerning the Maryland homicides.

A few minutes later, Detective Hugh Triggs of the Metropolitan Police Department (MPD) arrived at the field office and introduced himself as an MPD detective. Triggs inquired whether appellant understood his rights as already read to him, and whether he would consent to talk to him. Appellant replied that he understood his rights and would consent to speak to Triggs. Without stating that he was investigating the Myles homicide, Triggs asked appellant whether he had been in the District of Columbia on January 26, 1973. After denying his presence in the District of Columbia on that date, he admitted that he had driven into the city on that day to pay a traffic ticket. When Triggs asked whether he had driven along Warder Street that day, appellant answered, "I know what you're trying to get at. You're trying to get me involved in the shooting of the gambler." When Triggs again asked if appellant had been on Warder Street that day, he replied, "Well, I was driving down Warder Street on that day, and I saw the gambler falling. I must be a fool. I've said too much."

On the day after appellant's arrest, counsel was appointed to represent him in the extradition proceeding. On February 5, 1973, Deputy Sheriff Purdy came to the District to attempt to persuade appellant to return voluntarily to St. Mary's County. On that day, when contacted by Purdy seeking to interview appellant, appellant's counsel informed Purdy that he would advise appellant not to talk to Purdy, but that appellant could make his own decision. When Purdy attempted to interview him, appellant said that he would not discuss the Maryland offenses at that time, but that he

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. The waiver form read:
   Waiver of rights. I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer present at this time. I understand and know what I am doing. No promises or threats have been made to me, and no pressure or coercion of any kind has been used against me.

would do so at a later date. Between February 5 and March 7, Purdy did not see or speak to appellant, although Purdy drove into the District two or three times during that period in connection with the extradition proceedings. At those times, Purdy contacted appellant's counsel about interviewing appellant, but no interview occurred.

On March 7, however, Purdy, accompanied by a news reporter, went to the D.C. Jail to interview appellant without notifying his counsel about the intended interview.[4] Purdy read appellant his *Miranda* rights, which he agreed to waive. Purdy did not tell appellant of his discussions with his trial counsel concerning the interview or that he had not informed counsel of this interview. Purdy did state that if appellant desired the presence of his attorney, he would be summoned. Shreeves stated that he understood his *Miranda* rights and that he did not want to call his attorney. He agreed to speak with Purdy, but before appellant would talk about the Maryland crimes he demanded that the news reporter leave the room. After the reporter had left, Purdy again read Shreeves his *Miranda* rights. Appellant then made admissions to Purdy about the crimes.

During this same time period, appellant's counsel, believing that there could be a serious question concerning appellant's mental status, arranged for a clinical psychologist, Dr. Eugene Stammeyer, to examine appellant at the D.C. Jail on February 10, 1973. When Dr. Stammeyer supported counsel's concerns about appellant's mental status, counsel moved, on March 1, for an independent psychiatric examination by the Forensic Psychiatry Division. In the motion, counsel argued "the right to a psychiatric examination as close in time to the offenses charged is an important compo-

nent of his right to a fair trial and to due process." In its opposition, the government claimed the court had no power to order the requested examinations. Citing D.C.Code 1973, § 24–301(a), the government argued that authority to order a mental examination exists only when a person will stand trial in the District, and it represented that an examination relating to an insanity defense would have no purpose in the District since "any trial of this fugitive will be in Maryland." The court declined to order an independent psychiatric examination and on March 14, ordered that appellant be surrendered to Maryland to stand trial for murder.[5]

On April 4, 1973, following his rendition to Maryland, appellant was indicted in the District of Columbia for the Myles' murder. The same counsel who had represented him in the extradition case was appointed to represent him on the murder charge. He was arraigned on April 16, 1973.

In June, after appellant filed notice of intent to raise an insanity defense, the government moved for his commitment to St. Elizabeths Hospital pursuant to D.C. Code 1973, § 24–301(a) for mental examination. Appellant opposed the motion, arguing that there was an inherent conflict of interest in permitting the same doctors who provide treatment to those found incompetent or not guilty by reason of insanity to perform pretrial competency examinations. Instead, in July the appellant requested that the court order an examination by the Forensic Psychiatry Division. The court denied appellant's request and on August 1, 1973, ordered him to St. Elizabeths for a mental examination. On September 11, 1973, the court ordered that appellant also be examined by the Forensic Psychiatry Division. However, because he was in

4. During pretrial proceedings, Purdy testified that he and appellant's counsel several times discussed his desire to interview Shreeves and that he was under the impression that it was counsel's view that, ultimately, the decision whether to talk to Purdy was Shreeves'. Purdy stated that he did not recall whether appellant's counsel had ever indicated that it was

important for him to be present if Shreeves decided to speak to Purdy.

5. Upon his return to Maryland, appellant was subjected to mental examinations at Clifton T. Perkins Hospital. The results of these examinations were available to both the government and defense experts who testified at appellant's trial here in the District of Columbia.

Maryland defending against other charges, appellant was not admitted to St. Elizabeths until October 3, and the examination by the Forensic Psychiatry Division did not take place until March 1974.

On June 5, 1974, appellant moved to dismiss the indictment for lack of a speedy trial. The motion was denied. On June 17, the trial court began hearings on pretrial motions. Counsel moved to suppress, *inter alia,* (a) all evidence seized from appellant's car by the St. Mary's County police; (b) appellant's admissions concerning his presence in the District of Columbia on the day of the Myles murder given to MPD Detective Triggs; and (c) any evidence arising from Deputy Purdy's interrogation of appellant on March 7, 1973, without the knowledge or consent of Shreeves' counsel. The trial court denied the motions on June 25, 1974, ruling: (a) that the car had been abandoned and thus appellant had no standing to contest the search; (b) that appellant was properly advised of his *Miranda* rights and that his statements to Detective Triggs were admissible; and (c) that appellant understood his rights when Deputy Purdy interviewed him at the D.C. Jail, and that he waived his right to the presence and advice of counsel.

The first phase of the bifurcated trial began July 8, 1974.[6] After the issue of instructions had been settled and closing arguments completed, defense counsel requested that the court give a supplemental instruction on the felony murder charge.[7] The government objected that the instruc-

tion was untimely and factually and legally unsupportable. The trial court denied the request.[8]

During the deliberations, the jury requested further instruction on a simplified statement of felony murder. The court then reread the original felony murder instruction without objection from defense counsel. After the jury had left the courtroom, counsel again requested the supplemental instruction. The court denied the request.

On July 19, 1974, the jury returned a verdict of guilty on all counts. When the jury was polled, however, Juror 9 stated that she was undecided. The defense moved for a mistrial on the ground that the "undecided" juror could thereafter be intimidated by the other jurors. The motion was denied and the judge sent the jury back to resume deliberations with appropriate instructions on further deliberations. An hour later, the jury returned with a verdict of guilty on all counts.

The insanity phase of the trial commenced on November 6, 1974.[9] Shreeves presented testimony from four lay witnesses, one clinical psychologist, and one psychiatrist, all intended to satisfy his burden of proving insanity at the time of the offense. The government countered the insanity defense by presenting evidence of Shreeves' other violent crimes committed in Maryland contemporaneous to the Myles murder, as well as expert psychiatric testimony.

---

**6.** Appellant's counsel requested a bifurcated trial with two separate juries. The trial court denied this motion for separate juries and ruled that one jury should hear both the merits and the insanity phases of the case. This ruling is not challenged on this appeal.

**7.** The requested instruction read:

If you find that Carroll Milburn shot and killed the decedent Miles [*sic*] and that the defendant Bruce Shreeves was there at the time, but if you find that the shooting was outside the plans of the robbery and not in furtherance of the purpose, that is, that Milburn in shooting Miles [*sic*] was acting on behalf of himself and not on behalf of both he and Shreeves, then you may acquit Shreeves

of first degree murder, but convict him of armed robbery. [Tr. Vol. V, p. 2969]

**8.** The trial court gave the jury Standard Jury Instruction 4.22 that reads:

If two or more persons, acting together, are perpetrating or attempting to perpetrate robbery and one of them, in the course of the felony and in furtherance of the common purpose to commit the felony, kills a human being, both the person who committed the killing and the person or persons who aided and abetted in the felony are guilty of murder in the first degree.

**9.** The delay between the first and second phases of the bifurcated trial was for reasons not germane to this appeal.

Near the end of the insanity phase of the trial, the court called counsel to the bench and suggested that Juror 9 be discharged because she had repeatedly been inattentive during the trial. Defense counsel objected. When the trial court ruled that he would excuse Juror 9, defense counsel moved for the removal of Juror 8, who also had been inattentive. The judge replaced Jurors 8 and 9 with two alternate jurors who had heard all the evidence presented during both phases of the trial.

On November 21, 1974, the jury found that appellant had failed to establish the defense of insanity on any of the counts.

## II. APPELLANT'S RIGHT TO COUNSEL

Appellant claims that his Sixth Amendment right to counsel was violated by the use of statements obtained during the March 7 interview conducted without the presence or consent of his attorney. When appellant moved to suppress statements from that interview before trial, the trial court conducted an evidentiary hearing, at which both Deputy Purdy and appellant's counsel testified. The trial court found that Purdy twice advised appellant of his *Miranda* rights. In addition, the court found that although Purdy advised appellant that he had counsel and asked whether or not he wanted to have his counsel present during the interview, appellant indicated that he did not wish to confer with his attorney and consented to be interrogated without counsel being present. Finding that appellant understood his rights, the trial court ruled that appellant validly waived his right to counsel.

Appellant now argues that a defendant who has been charged formally and who is represented by counsel has a right to have his attorney notified before he is interrogated by government officials. He contends that the right to notification of his attorney is a corollary to his Sixth Amendment right to counsel, and any statement made during an interview conducted without notice to his attorney should be suppressed.

At the outset, we must address the question whether a defendant may ever waive his right to the presence of counsel, after it has attached, without notice to or consultation with his attorney. Various federal circuit courts of appeal and state courts have answered this question differently. *See, e. g., United States v. Thomas,* 474 F.2d 110 (10th Cir.), *cert. denied,* 412 U.S. 932, 93 S.Ct. 2758, 37 L.Ed.2d 160 (1973); *United States v. Springer,* 460 F.2d 1344, 1350 (7th Cir.), *cert. denied,* 409 U.S. 873, 93 S.Ct. 1305, 34 L.Ed.2d 125 (1972); *United States ex rel. O'Connor v. New Jersey,* 405 F.2d 632 (3d Cir.), *cert. denied,* 395 U.S. 923, 89 S.Ct. 1770, 23 L.Ed.2d 240 (1969); *State v. Witt,* 422 S.W.2d 304 (Mo.1967); and *State v. Green,* 46 N.J. 192, 215 A.2d 546 (1965), *cert. denied,* 384 U.S. 946, 86 S.Ct. 1475, 16 L.Ed.2d 544 (1966). Although the Supreme Court has not specifically resolved the issue, we believe that the holding in *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 423 (1977), supports the view that a defendant may waive his right to counsel without consulting his attorney.

In *Brewer, supra,* the defendant was convicted of murder in the abduction of a 10-year-old girl which occurred in Des Moines, Iowa. After turning himself in to authorities in Davenport, Iowa, two days after the child's disappearance, the defendant Williams was formally charged with abduction. Williams, an escaped mental patient, conferred in person with an attorney in Davenport and by telephone with his attorney in Des Moines. Both attorneys told Williams to make no statement during the ride from Davenport back to Des Moines and that the police had agreed not to question him. During the ride, Williams indicated that he would give the police a statement after he spoke with his attorney upon arrival in Des Moines. Nonetheless, during the ride one of the officers coaxed Williams into revealing the site of the child's grave.

The Supreme Court ruled that at that time, Williams was entitled to the assistance of counsel. Although Williams apparently understood his right to counsel, *"waiver requires not merely comprehension*

but *relinquishment,* and Williams' consistent reliance upon the advice of counsel in dealing with the authorities refutes any suggestion that he waived that right." 430 U.S. at 404, 97 S.Ct. at 1242. (Emphasis added.) The Court stated further:

> The Court of Appeals did not hold, nor do we, that under the circumstances of this case Williams *could not,* without notice to counsel, have waived his rights under the Sixth and Fourteenth Amendments. It only held, as do we, that he did not. [*Id.* at 405–06, 97 S.Ct. at 1243 (footnote omitted) (emphasis in original).]

■ In his concurrence, Justice Powell states explicitly what we, too, infer from the majority's holding:

> The dissenting opinion of THE CHIEF JUSTICE states that the Court's holding today "conclusively presumes a suspect is legally incompetent to change his mind and tell the truth until an attorney is present." I find no justification for this view. On the contrary, *the opinion of the Court is explicitly clear that the right to assistance of counsel may be waived, after it has attached, without notice to or consultation with counsel.* We would have such a case here if the State had proved that the police officers refrained from coercion and interrogation, as they have agreed, and that Williams freely on his own initiative had confessed the crime. [*Id.* at 413, 97 S.Ct. at 1246 (citations omitted) (emphasis added).]

Cases since *Brewer* also reject a *per se* prohibition against communications between police and defendants without prior notice to counsel. *E. g., United States v. Brown,* 569 F.2d 236 (5th Cir. 1972) (en banc); *United States v. Rodriguez-Gastelum,* 569 F.2d 482 (9th Cir. 1978) (en banc); *Watson v. State,* 282 Md. 73, 382 A.2d 574 (1978). We agree with the courts' holding that a defendant may waive his right to counsel without prior notice to or consultation with his attorney.

Although the right to counsel thus may be waived, the government bears a heavy burden to show: (1) that the defendant understood that in fact he had a right to the presence of counsel during an interrogation, *see Brewer v. Williams, supra,* 430 U.S. at 404, 97 S.Ct. 1232; and (b) that the defendant intentionally relinquished or abandoned that "known right," *Johnson v. Zerbst,* 304 U.S. 458, 465, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); *Brewer v. Williams, supra,* 430 U.S. at 404, 97 S.Ct. 1232. *See United States v. Rodriguez-Gastelum, supra* at 485 (citing *Brewer* for the proposition that "the burden is greater when the government attempts to show a waiver after the right to counsel has been asserted than when the government attempts to show a waiver of the right to remain silent"); *United States v. Cobbs,* 481 F.2d 196, 199 (3d Cir.), *cert. denied,* 414 U.S. 980, 94 S.Ct. 298, 38 L.Ed.2d 224 (1973); *United States v. Springer, supra* at 1352.

In deciding whether the government has satisfied its greater burden, the trial court may look to the particular facts and circumstances surrounding the case, including the experience, background, and conduct of the defendant. *Johnson v. Zerbst, supra,* 304 U.S. at 464, 58 S.Ct. 1019; *United States v. Rodriguez-Gastelum, supra* at 488. The trial court should conduct an on-the-record inquiry of the police official, defense counsel, and other appropriate witnesses. The court must make *findings of fact* to ensure that the record clearly reflects that the waiver of the presence of counsel was a knowing, voluntary, and intelligent relinquishment of a known right. *United States v. Cobbs, supra* at 200.

■ The record in this case reflects thorough examination of both Deputy Purdy and trial counsel. There was evidence to support the trial court's finding that appellant was advised twice of his right to the presence of counsel and that appellant refused Deputy Purdy's offer to call counsel. We find no error in the trial court's ruling that Shreeves validly waived his right to the presence of counsel during the interrogation by Deputy Sheriff Purdy.[10]

---

10. This case is distinguishable from *Brewer v. Williams, supra,* in several significant respects.

First, unlike Williams, appellant Shreeves never asserted that he wanted to speak to his

Despite our holding that under the appropriate circumstances the right to the presence of counsel may be waived, we reiterate what we said in *Boykins v. United States*, D.C.App., 366 A.2d 133, 135 (1976):

> [T]he government ordinarily should not communicate with a represented defendant without notice to, and permission of, the counsel. . . . . [Communications without prior notice to counsel] is a highly questionable governmental practice. Undoubtedly, too, the Bar would make itself heard if counsel, or their agents, were to make it a practice to interview, without advance notice to counsel, clients of opposing lawyers in civil or criminal cases. . . . It is a matter of fundamental legal ethics that this not be done (American Bar Association, Code of Professional Responsibility DR 7–104).

### III. GOVERNMENTAL MISSTATEMENTS AND DELAY

#### A.

Appellant asserts that his Fifth Amendment due process rights were violated by the court's denial of his request at the extradition hearing for an immediate psychiatric examination. He argues that the denial was based on the government's erroneous assertions that because appellant would not be tried in the District of Columbia, the court had no authority to order the requested mental examination. He claims that these government misstatements severely hampered his ability to present an effective insanity defense since the only person who examined him at the time of his

arrest was a psychologist whose opinions were assailed by the government at trial for bias as a defense-retained expert and whose opinions were denigrated as those of a psychologist rather than a psychiatrist.[11]

Appellant also raises the issue of preindictment delay. According to appellant, the government deliberately delayed indicting him for the Myles murder until after the extradition proceedings to prevent an immediate psychiatric examination. Thus, says appellant, the government's misstatements at the extradition proceedings were consistent with the government's plan to delay his indictment.

To prevail on his claim that his due process rights were violated by delay, a defendant must show that the delay "caused substantial prejudice to [his] right to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused." *United States v. Marion*, 404 U.S. 307, 324, 92 S.Ct. 455, 465, 30 L.Ed.2d 468 (1971). If a defendant can satisfy this two-pronged burden, due process mandates dismissal of the indictment. *Id.*

We conclude that appellant failed to prove either of the *Marion* requirements, and that the court correctly denied his motion to dismiss the indictment. First, it is not clear that the government's misstatement was "an intentional device to gain tactical advantage over the accused." The government did have within its possession the admissions appellant made to Detective Triggs at the time of his arrest as well as some initial testimony given by Milburn to the grand jury investigating the Myles homicide. However, Milburn appeared a

---

attorney before making statements to Detective Purdy. Second, in contrast with *Brewer*, although Detective Purdy had contacted Shreeves' counsel about the possibility of questioning appellant, there is no proof that Shreeves' attorney requested Purdy to refrain from interrogating Shreeves unless his counsel was present. In fact, Purdy was left with the impression that the decision whether to talk to him was entirely Shreeves'. Finally, while the only evidence indicating a knowing and voluntary waiver in *Brewer* was the fact that Williams had actually confessed, the validity of

Shreeves' waiver is supported by the fact that Purdy twice read appellant his *Miranda* rights and offered to call his attorney before questioning him, and that appellant indicated he understood his rights, declined the offer to call his attorney, and agreed to waive his rights before confessing to Purdy.

11. In the context of this case, we have no occasion to decide whether one alleged to be a fugitive, upon an appropriate showing, has a right to a competency hearing and determination prior to an extradition hearing.

second time before the grand jury on March 29, 1973, two weeks after appellant had been ordered returned to Maryland. This latter appearance by Milburn is consistent with a good faith effort by the government to present an appropriate case to the grand jury in order to secure an indictment. On this record, we cannot say the trial court erred in finding that the government was not attempting to gain a tactical advantage by delaying appellant's indictment to prevent an immediate mental examination.

Even if appellant had satisfied the first prong of the *Marion* test, he still must show that the delay caused him "substantial prejudice." The trial court found to the contrary. Shortly after appellant was transferred to the Maryland authorities pursuant to the extradition order of March 14, 1973, he received a psychiatric examination at Clifton T. Perkins State Hospital. The results of this examination were available to appellant in his District of Columbia trial and could have been utilized by him. While it is true that a mental examination at a state hospital is not the type of independent psychiatric examination which appellant sought, its availability coupled with the lack of any further showing of "substantial prejudice" lead us to conclude that the trial court properly denied the motion to dismiss the indictment.

### B.

Appellant also claims that his Sixth Amendment right to a speedy trial was violated as a result of the nearly seventeen-month delay between his arrest on February 2, 1973, and the commencement of his trial on June 26, 1974. A delay of more than one year provides "prima facie merit" to a claim of speedy trial deprivation, *Branch v. United States*, D.C.App., 372 A.2d

998, 1000 (1977); *United States v. Mack*, D.C.App., 298 A.2d 509, 511 (1972); *United States v. Holt*, 145 U.S.App.D.C. 185, 186, 448 F.2d 1108, 1109, *cert. denied*, 404 U.S. 942, 92 S.Ct. 292, 30 L.Ed.2d 257 (1971), which raises its own presumption of prejudice. The government then has the burden of affirmatively showing the absence of prejudice. *Day v. United States*, D.C.App., 390 A.2d 957, at 970 (1978); *United States v. Bolden*, D.C.App., 381 A.2d 624, 627–28 (1977); *Branch v. United States, supra* at 1000. In addition, in assessing a speedy trial claim we must apply a balancing test, weighing not only the length of the delay and prejudice to the defendant, but also the reason for the delay and the timeliness of defendant's assertion of his right to a speedy trial. *Barker v. Wingo*, 407 U.S. 514, 523, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

■ Here the delay totaled sixteen months and twenty-three days from the time appellant was brought before the Superior Court on the fugitive charge until jury selection began for his trial.[12] The delay was caused by three factors: (1) pretrial motions and hearings; (2) appellant's own unavailability due to trial proceedings in Maryland; and (3) controversy concerning appellant's mental examination at St. Elizabeths Hospital.[13] The time required to resolve pretrial motions is regarded as neutral. *United States v. Jones*, 154 U.S.App. D.C. 211, 213, 475 F.2d 322, 324 (1972). The delays caused by overcrowded dockets are chargeable to the government, but the government bears a less heavy burden in the speedy trial calculus for such than for delays resulting from more purposeful governmental conduct. *United States v. Jones, supra* at 213, 475 F.2d at 324; *United*

12. Although Shreeves was not formally indicted on the D.C. charges until April 4, 1973, we believe that the appropriate time frame for a speedy trial analysis, on the particular facts in this case, should commence from the time of actual restraint imposed by arrest and holding to answer a criminal charge. Thus, we deem the starting point of the time calculation to be February 3, 1972. *United States v. Marion, supra*, 404 U.S. at 320, 92 S.Ct. 455; *Dilling-*

*ham v. United States*, 423 U.S. 64, 96 S.Ct. 303, 46 L.Ed.2d 405 (1975).

13. The controversy over the mental examinations concerned appellant's request to be examined by Forensic Psychiatric rather than St. Elizabeths, and his later request that his attorney be present during the St. Elizabeths examination.

*States v. Perkins,* D.C.App., 374 A.2d 882, 883–84 (1977). The time spent in the dispute over the procedures to be used during appellant's mental examination at St. Elizabeths, and the delay caused by the two mental examinations, approximately five months, "are not normally taken into account for purposes of determining the question of a denial of speedy trial" since " 'a principal cause of postponement [was] the deliberate pace of the system of safeguards designed to protect the accused . . . .' " *United States v. Canty,* 152 U.S.App.D.C. 103, 107, 469 F.2d 114, 118 (1972), quoting *Blunt v. United States,* 131 U.S.App.D.C. 306, 310, 404 F.2d 1283, 1287 (1968), *cert. denied,* 394 U.S. 909, 89 S.Ct. 1021, 22 L.Ed.2d 221 (1969). Moreover, the delay of approximately four and one-half months spent in the Maryland proceedings is essentially "neutral" time, chargeable to neither party unless the totality of the circumstances indicate otherwise. *United States v. Canty, supra,* 152 U.S.App.D.C. at 107–08, 469 F.2d at 118–19. Thus, of the nearly seventeen-month delay, approximately nine and one-half months were chargeable to neither side. The remaining seven and one half months' delay was chargeable to the government but was essentially neutral time due to court congestion.

Appellant did not assert his right to a speedy trial until June 5, 1974, sixteen months after arrest. Thus, most of the delay complained of occurred before the speedy trial demand and must be accorded less significance. *See United States v. Jones,* 173 U.S.App.D.C. 280, 297, 524 F.2d 834, 851 (1975).

The assessment of whether the government has successfully rebutted the presumption of prejudice to the defendant, given the delay of more than one year, requires an evaluation of three factors: (1) prevention of oppressive pretrial incarceration; (2) minimization of anxiety and concern of the accused; and (3) possible impairment of the defense. *Barker v. Wingo, supra,* 407 U.S. at 532, 92 S.Ct. 2182. Examination of the record shows that the government has satisfied its burden to rebut the presumption of prejudice which arises from a delay of greater than one year. *See Branch v. United States, supra.* Because appellant was incarcerated on the Maryland charges as well as on the District of Columbia charges, the delay in the District of Columbia did not cause oppressive pretrial incarceration nor significant additional anxiety.[14] The record establishes that the seventeen-month delay in no way impaired Shreeves' ability to present his defense. On this record, we cannot say that the trial court erred in rejecting the appellant's claim of a deprivation of his right to a speedy trial.

## IV. SUPPRESSION ISSUES

Appellant contends that the trial court erred in declining to suppress evidence obtained as a result of the warrantless search of his car. The trial court ruled that the car had been abandoned and that appellant had no standing to contest the search. While we reject the trial court's rationale, we agree that the search was constitutionally permissible and thus the evidence seized therefrom was admissible.

■ In discussing abandonment, this court has stated:

> The issue is not abandonment in the strict property-right sense, but whether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search . . . . [*United States v. Boswell,* D.C.App., 347 A.2d 270, 274 (1975) quoting *United States v. Colbert,* 474 F.2d 174, 176 (5th Cir. 1973).]

It is apparent from the fact that Shreeves left a substantial number of his personal belongings in the car that, at the time he

---

14. For a discussion of the methodology of this court's analysis of the government's rebuttal of defense arguments about pretrial incarceration and "anxiety," *see Day v. United States, supra* at 970–972.

parked the car, he did not "voluntarily . . . relinquish his interest in the property." *Id.* Rather, his actions evinced "an intent . . . to secrete [the car] and not to abandon it." *Id.* Since the government has failed to meet its burden of showing abandonment "by clear, unequivocal and decisive evidence," *Peyton v. United States,* D.C.App., 275 A.2d 229, 230 (1971), we hold that there was no abandonment, and thus that appellant did have standing to contest the search.

■ Fourth Amendment doctrines state that "a car may be searched or seized without a warrant if there were both exigent circumstances and probable cause to believe that the car will yield contraband or evidence useful for prosecution of crime." Note, *Warrantless Searches and Seizures of Automobiles,* 87 Harv.L.Rev. 835 (1974) (footnote omitted). The probable cause element was clearly present here. The facts (as more fully outlined in Part I, *supra*) that several violent incidents in Maryland had occurred in the days immediately preceding the discovery of appellant's car involving both appellant and his automobile, constituted a strong showing of probable cause to conclude that evidence of the crimes likely would be found in the car. *See Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

Because no warrant was obtained, we must determine whether the government showed "that the exigencies of the situation made [the warrantless search] imperative." *Coolidge v. New Hampshire,* 403 U.S. 443, 455, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), quoting *McDonald v. United States,* 335 U.S. 451, 456, 69 S.Ct. 191, 93 L.Ed. 153 (1948).

■ We note at the outset that this case falls within the so-called "automobile exception" to the warrant requirement that premises exigency on mobility. *Carroll v. United States, supra; Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). Although the car was immobile when found, Deputy Purdy testified that he did not have sufficient personnel to post a guard around the car until he could obtain a search warrant. Since the police could have

no assurance of continued immobilization without a guard, the circumstances presented a sufficient exigency to search the car without obtaining a warrant. *See United States v. Free,* 141 U.S.App.D.C. 198, 202, 437 F.2d 631, 635 (1970). *Cf. United States v. Robinson,* 174 U.S.App.D.C. 351, 353–54, 533 F.2d 578, 580–81 (en banc) *cert. denied,* 424 U.S. 956, 96 S.Ct. 1432, 47 L.Ed.2d 362 (1976) (record revealed "surfeit," rather than shortage of police officers to guard car.)

Moreover, we believe that the circumstances place this case within the "getaway car exigency" created by the United States Court of Appeals for the District of Columbia in *United States v. Robinson, supra.* In *Robinson,* shortly after a bank robbery, the police spotted what they had probable cause to believe was the getaway car. The police surrounded the car, then unlocked it, and a search produced evidence of the crime. The court, sitting en banc, ruled that the search fell "within the spirit, though not the text, of the 'hot pursuit' exception established in *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967)." *United States v. Robinson, supra* at 356, 533 F.2d at 583.

What the court in *Robinson* said applies with equal force to the exigency here:

[T]his getaway car case entails exigent circumstances that justify a warrantless search of the car for clues as to identity or location of suspects. The pertinent factors are much like those set out by this court in *Dorman v. United States,* 140 U.S.App.D.C. 313, 319–21, 435 F.2d 385, 391–93 (en banc, 1970), as showing "urgent need" justifying a warrantless nighttime entry into a private home to effect an arrest. As in *Dorman,* we have a grave offense; a clear showing of probable cause; a reasonable belief that suspects are armed; a likelihood that the suspects will escape if not speedily apprehended, and peaceable entry. This case lacks the element of "strong reason to believe the suspect is in the premises being entered," which was stressed in *Dorman* as justifying a warrantless entry into the suspect's home to make an ar-

rest. But in the case of a car on the street there is both lesser expectation of privacy than in a home . . ., and the entry into a car believed on strong probable cause to be the getaway car is justified, even though the suspect is plainly not now inside, in order to get clues that will aid location and apprehension of the suspect. [*Id.* at 356–57, 533 F.2d at 583–84 (footnotes omitted).]

We hold therefore that because the circumstances surrounding the search of appellant's car provided probable cause as well as an exigency, the search was justified, and the trial court was correct in refusing to suppress the evidence obtained as a result of the search.[15]

## V. OTHER CLAIMS

### A. Jury Instructions

■ Appellant argues that the trial court's refusal on two occasions to give his requested supplemental felony murder instruction constitutes reversible error.[16] Because neither of these requests was timely made, we find no error.

Prior to the close of the evidence, each side submitted proposed instructions. The trial court discussed the proposed instructions with counsel and ruled on them prior to closing arguments. After the completion of closing arguments, and immediately before charging the jury, the trial court conferred with counsel for both sides, and indicated which instructions he planned to give the jury. At that time, defense counsel submitted his supplemental felony-murder instruction. After retiring, the jury requested a clarifying instruction on felony-murder. The judge conferred with both counsel and reread the original instruction.

Only after the jury retired again did defense counsel suggest that the trial court give the previously-requested supplemental instruction.

Super.Ct.Cr.R. 30, which is identical to the federal rule, sets forth the procedural requirements for jury instruction requests:

At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. At the same time, copies of such requests shall be furnished to adverse parties. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the court shall instruct the jury after the arguments are completed. No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury and, on request of any party, out of the presence of the jury.

The requirement that the court inform counsel of its proposed action upon the requests before closing arguments necessarily requires that requests for instructions be submitted prior to closing argument. The time limitation enables opposing counsel both to object to a proposed instruction and to frame his closing argument to address the potential effect on the jury of the requested instruction. *See United States v. Tourine*, 428 F.2d 865, 868–69 (2d Cir. 1970), *cert. denied*, 400 U.S. 1020, 91 S.Ct. 581, 27

---

**15.** Appellant also claims error in the trial court's refusal to suppress incriminating statements made to Detective Triggs concerning the Myles murder pursuant to *Miranda v. Arizona, supra.* The record is clear that although Triggs did not repeat the *Miranda* warnings, he entered the interview room only a few minutes after appellant had been read the *Miranda* warning and that Triggs was aware of this fact. He asked appellant if he understood his rights and whether appellant would consent to talk to him. Moreover, he specifically identified himself to appellant as a District of Columbia de-

tective who specialized in homicide cases. It was only thereafter that he questioned appellant. We are satisfied that appellant's waiver of his rights to silence was valid. *See United States v. Vasquez*, 476 F.2d 730, 732 (5th Cir.), *cert. denied*, 414 U.S. 836, 94 S.Ct. 181, 38 L.Ed.2d 72 (1973).

**16.** The requested instruction set forth one of the defense theories that the murder was committed by Milburn and was outside the scope of the robbery.

L.Ed.2d 631 (1971); *Schuermann v. United States,* 174 F.2d 397, 401 (8th Cir.), *cert. denied,* 338 U.S. 831, 70 S.Ct. 69, 94 L.Ed. 505 (1949).

Here, counsel did not propose his instruction until after closing argument was completed. The record reflects no extenuating circumstances that prevented defense counsel from formulating his request earlier. Therefore, we hold that because the defense failed to comply with the time requirements of Super.Ct.Cr.R. 30, the trial court did not err in denying the request.

[redacted] We also hold as untimely the defense request for the supplemental instruction following the rereading of the instructions to the jury. Had defense counsel requested the supplemental instruction before the jury retired again, the trial judge then could have exercised his discretion in determining how to respond to the jury's request for clarification. *See United States v. Wharton,* 139 U.S.App.D.C. 293, 296, n.9, 433 F.2d 451, 454 n.9 (1970). However, the record reflects the defense request *after* the jury had retired. Such an untimely request violates the clear purpose of Super.Ct.Cr.R. 30.

B. Juror Substitution

[redacted] Appellant claims error in the trial court's substitution of two inattentive jurors just prior to deliberation of the insanity phase of the trial. He argues that Super.Ct.Cr.R. 24(c) prevents the substitution of jurors with alternates during the second phase of a bifurcated trial. This rule provides in pertinent part:

> Alternate jurors shall be drawn in the same manner, shall have the same qualifications, shall be subject to the same examination and challenges, shall take the same oath and shall have the same functions, powers, facilities and privileges as the regular jurors. An alternate juror who does not replace a regular juror shall be discharged at the time that the jury retires to consider its verdict.

Appellant's contention is based on the premise that when the jury retires to consider the merits portion of a bifurcated trial, the jury has "retired to consider its verdict," and thus the alternates should be dismissed. However, this premise is incorrect. In a bifurcated trial, as well as in a unitary trial, the verdict is the jury's ultimate and definitive response to all of the issues which have been presented to it. *Baldwin v. State,* 185 Tenn. 205, 204 S.W.2d 1018 (1947); *State v. Williams,* 89 N.J.L. 234, 98 A. 416 (1916); *State v. Blue,* 134 La. 561, 64 So. 411 (1914). In a trial which has been bifurcated into a merits phase and an insanity phase, but which is to be heard by one jury, there is only one verdict in the case. And that verdict is rendered at the close of the insanity phase (assuming, of course, that the insanity issue has been reached). *See Burks v. United States,* 1 U.S. 437, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *Davis v. United States,* 160 U.S. 469, 6 S.Ct. 353, 40 L.Ed. 499 (1895).

Thus, in a bifurcated trial where the same jury hears both phases, Rule 24(c) dictates that the alternates should not be dismissed until the jury retires at the end of the second phase. The trial court here acted within its authority in substituting alternates for the two inattentive jurors at the conclusion of the second phase.[17]

*Affirmed.*

[redacted]

17. We find no merit in appellant's alternate argument that the juror substitution resulted in a denial of his Sixth Amendment right to trial by jury.