Richard H. JACKSON, a/k/a Leland F. Spencer, Appellant,

v.

·UNITED STATES, Appellee.

No. 12776.

District of Columbia Court of Appeals.

Argued Dec. 20, 1978.

Decided July 2, 1979.

Andrew L. Lipps, Public Defender Service, Washington, D. C., for appellant. Robert P. Mosteller, Public Defender Service, Washington, D. C., also entered an appearance, for appellant.

Estelle D. Kumar, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, Michael W. Farrell and William J. Hardy, Asst. U. S. Attys., Washington, D. C., were on brief, for appellee.

Before YEAGLEY and MACK, Associate Judges, and PRATT, Associate Judge, Superior Court of the District of Columbia.*

PRATT, Associate Judge:

On March 24, 1976, the appellant was charged, in a three-count indictment, with first degree murder, D.C.Code § 22–2401, second degree murder, D.C.Code § 22–2403, and robbery, D.C.Code § 22–2901. Appellant filed pretrial motions to suppress oral statements which he made to the police, and to suppress two blankets, allegedly taken from the victim's house, which were found in the appellant's car. Appellant also filed a notice of intention to rely on the defense of insanity and moved for a bifurcated trial, with a separate jury impanelled for each phase of the trial. The trial court heard argument on the motions on June 16, 1977. The court suppressed statements made by the appellant to the police before he was advised of his *Miranda* rights, but denied his other motions to suppress. In respect to the insanity defense, the court ordered bifurcation but insisted that both stages of the trial be heard by the same jury and denied appellant's request for a separate voir dire concerning the insanity issue. On June 28, 1977, following the guilt phase of the trial, the jury, after sixteen hours of deliberation, found appellant guilty of second degree murder and robbery. On July 13, 1977, following the insanity phase

of the trial, the same jury, again after lengthy deliberation, rejected appellant's insanity defense.

Appellant appeals his conviction on several grounds: (1) that he was illegally arrested in Maryland and transported to the District, (2) that the warrantless seizure of a green blanket from the back floor of his car violated his Fourth Amendment rights, (3) that the subsequent seizure of a white blanket from the trunk of his car was not pursuant to a valid third-party consent, (4) that the statements elicited from him, after he exercised his *Miranda* rights, were obtained in violation of his Fifth and Sixth Amendment rights, (5) that the trial court committed reversible error by denying the request of both parties for a separate voir dire of the jury panel before the insanity phase of the trial.[1] We disagree with appellant's first three claims of error, but agree that appellant's statements should have been suppressed and that the prescribed procedure for jury selection was an abuse of the trial court's discretion. We reverse on these two issues.

## FACTS

The occurrences which gave rise to appellant's conviction began on January 14, 1976, when Doritha King was killed in her home at 1044 44th Street, N.E., Washington, D.C. Mrs. King's body was discovered at approximately 3:30 P.M. on January 15, 1976. The autopsy revealed that the cause of death was strangulation and beating. Detective William Wood of the homicide branch of the Metropolitan Police Department, arrived on the scene shortly after 3:30 P.M., and ascertained from various neighbors that a new electric heater, clock radio, portable television and two new blankets, one green and one white, were missing from the victim's home. These items were last seen in Mrs. King's home at approximately 3:30–

*Sitting by designation pursuant to D.C.Code 1973, § 11–707(a).

1. Because of the manner in which we dispose of these issues, we need not reach the remaining two raised by appellant, namely: whether the admission of evidence referring to the insanity defense during the guilt phase of the trial and alleged prosecutorial misconduct during cross-examination and closing argument were reversible error.

4:00 P.M. on January 14, 1976. Wood also learned from one Bennie Price, who had known appellant for several years, that the appellant, along with another individual, was drinking with the victim during the early evening hours of January 14. Mr. Price further informed Wood that the appellant's car was parked across the street from the victim's home between 11:00–11:30 P.M. on January 14.

Subsequently, Wood ascertained that appellant was assigned to a halfway house in Maryland. After several unsuccessful attempts to contact appellant, Wood learned, on January 28, that the appellant was at the halfway house. When Wood arrived at the house, however, the appellant was gone. Wood then contacted the Prince George's County Police, and asked them to stop and hold appellant because he was wanted for questioning in the District, in connection with a homicide investigation.[2] That same night, January 28, at approximately 9:00 P.M., Prince George's County Police Officer Edgar stopped appellant's car and asked for his license and registration; appellant produced one but not the other. Suspicious of appellant's ownership of the car,[3] Officer Edgar requested and received appellant's consent to search the car. During this search, Officer Edgar observed property, including two blankets. Officer Edgar then informed appellant that he was wanted for questioning by the District of Columbia homicide squad and asked appellant to accompany him to the Hyattsville Police Station. Appellant rode with Officer Edgar to the station, he sat in the front seat and was not handcuffed.

When Wood, accompanied by Detective Wilson, arrived at the Hyattsville station, Officer Edgar related his observations upon searching the appellant's car, including his sighting of the two blankets. Wood in-formed the appellant that the detectives wished to speak with him in the District, the appellant agreed to accompany them back to the District. Appellant directed the detectives to the area where his car was parked. When they reached his car, however, appellant had trouble starting it, so Wood held a flashlight while appellant made repairs. While holding the flashlight, Wood peered into appellant's car and saw a green blanket on the back floor. Once the car was repaired, Wood asked appellant to follow the detectives into the District in his own car. Appellant agreed but then declared he did not have enough gas. Wood then offered to buy gas for appellant's car, and appellant, driving his own car, led the way to a gas station. Once at the gas station, however, appellant informed the detectives he was "willing to go anywhere you want to go" but he refused to drive into the District because his license had been revoked in the District, and he was fearful that his car would be impounded. Appellant then decided to make arrangements to leave his car in an open area of the gas station and got into the detectives' car.

Appellant and the detectives arrived at the District station at approximately 11:00 P.M. Appellant was placed in an interview room, which was sectioned off from the main office, which had no telephones and was not readily accessible. Detective Wood, now accompanied by Detective Newcomb, did not advise appellant of his *Miranda* rights but began to question appellant as to his familiarity with the neighborhood of 1044 44th Street. Appellant initially stated that he did not know anyone who lived in that neighborhood, but then remembered that his friend, Bennie Price, resided in the area. He denied knowing the victim, Mrs. King, but then remembered that he had fixed some pipes for her three weeks earlier, and then admitted that he had been

2. The record shows that Detective Wood informed the Prince George's County Police that he did not have a warrant for the appellant's arrest. (TR I, p. 42). Wood had, in fact, sought a warrant for the appellant's arrest but authorization was denied by the U.S. Attorney's Office on January 23, 1976. (TR I, p. 154).

3. Officer Edgar testified that his suspicions were aroused by appellant's failure to produce both his license and the registration as well as by the fact that the car's ignition had been punched out. (TR I, p. 251).

drinking with her on the night of January 14, 1976.[4] Upon hearing these conflicting stories, Detective Wood placed the appellant under arrest and read him his *Miranda* rights. Appellant told the detectives and indicated on a PD Form 47 that he did not wish to answer questions and was not willing to answer questions without an attorney present.

After appellant had asserted his *Miranda* rights, Wood and Newcomb began to do the necessary paperwork for the arrest and requested that appellant provide them with handwriting exemplars. At approximately 12:30 A.M., while providing these exemplars, appellant began a long, rambling, partially incoherent monologue explaining his belief that each individual has four states of being. He further told Detective Newcomb that he was being controlled by certain powers and forces which acted upon him like a magnet. Newcomb asked appellant to explain and elaborate upon what he was saying. In the course of this questioning, Newcomb asked appellant whether any of these states of being killed Mrs. King. Appellant stated that it was possible that one of his four states could have killed her. This interrogation concluded at approximately 3:30 A.M., close to four and one-half hours after appellant had been formally placed under arrest.

At approximately 2:00 A.M. that morning, Wood asked Detective Forbes, of the homicide squad, to return to appellant's car to seize the green blanket, which Wood had seen on the back floor. With the use of a flashlight, Forbes was able to see the green blanket on the back floor and seized it. At that time, the car was unlocked, and while not on a public street, it was in an area to which the public had free access.

Further investigation revealed that appellant's car was registered to Eva Tampers. On February 13, 1976, Detective Wood went to the Tampers' residence to obtain their permission to search the vehicle. Upon his arrival at the Tampers, Wood *was informed* by Mr. Tampers that the registration was still in their name, their tags were still on the car and that he felt responsible for the car. Subsequently, Wood and Mr. Tampers went to the gas station where the appellant had left the car; Mr. Tampers identified the car as his and gave Wood consent to search it. Wood's search of the trunk of the car led to the discovery of a white blanket, matching the description of the one taken from the victim's house. Following this search, Wood learned that, in fact, the Tampers had given the car to Edward Abney (who later gave it to the appellant) and they did not expect the car back.

Prior to trial, appellant filed a Motion for Bifurcation and for separate jury trials on the merit and responsibility issues. During oral argument on this motion, appellant retreated from his original demand and joined with the government in requesting bifurcation with several alternate jurors being impanelled with the merit jury, and the same jury or a combination of the same jury and alternatives serving in the insanity phase. The joint suggestion included conducting a separate voir dire before each phase of the trial, challenges for cause at each phase, normal peremptory challenges at the merit phase and some limited peremptory challenges for the responsibility phase.

After full exploration of the views of the parties, including their proffers of what the evidence would show, the court granted appellant's Motion for Bifurcated Trial but refused to impanel separate juries or follow the procedure outlined by the parties in their joint application. Instead, the court, over defense counsel's objections, informed the jury panel during voir dire,[5] that there may be instructions as to the defense of insanity and inquired whether any of the potential jurors would not be able to apply the relevant law. The court also required the appellant to introduce to the panel the six psychiatrists appellant intended to call as witnesses in the insanity phase.

---

4. These statements were suppressed by the trial court. (TR I, p. 273).

5. The single voir dire was conducted prior to the merit phase.

## I–ARREST

Appellant's first argument is that he was illegally arrested in Maryland, thus the statements he made to the police as well as the blankets seized from his car should be suppressed as fruits of an illegal arrest. *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Appellant concedes that he was not formally arrested in Maryland, but he asserts that beginning with the stop made by Officer Edgar, the appellant's freedom was restrained, he was not at liberty to leave, therefore he was in fact under arrest. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *Accord Campbell v. United States,* 273 A.2d 252, 254 (D.C.App. 1971). Appellant advances two reasons as to why this *de facto* arrest was illegal: it was made without probable cause, and appellant was transported from Maryland to the District without being afforded an extradition hearing.

The trial court found that the appellant was not arrested in Maryland, even though there was probable cause to justify such an arrest; the court found that no arrest was made until appellant was brought to the District station. Since the trial court made certain factual findings in reaching its decision to deny appellant's motions, those findings are not to be disturbed unless clearly erroneous. *Brooks v. United States,* 367 A.2d 1297, 1302 (D.C.App.1976). A review of the record does not support a finding that the trial court was clearly in error.

■ Officer Edgar testified at the evidentiary hearing that, in response to the locator put out by the District police, he stopped appellant at approximately 9:00 P.M. on January 28, 1976. Appellant produced either his license or the registration, but not both. Edgar then asked appellant to "come to Hyattsville with me while we verified the information, and [because] the D.C. homicide squad wanted to talk to him." Edgar testified further that he would have let appellant go if the latter did not want to come with him. Appellant entered the front seat of the car and rode, unhandcuffed, with Officer Edgar to the Hyattsville station.[6] Upon arrival at the station, appellant sat in an open, unbarred area and waited for Detective Wood. Officer Edgar's actions, as reflected in the record, do not clearly show that appellant was arrested by the Maryland police.[7]

■ Similarly, the actions of Detectives Wood and Wilson, in transporting the appellant into the District, do not clearly show that he was in fact arrested by these officers while in Maryland. The trial court found that the appellant voluntarily returned to the District with the detectives and the record supports such a finding. This court has determined that, when evaluating the voluntariness of a suspect's decision to accompany police officers across the border between the District and Maryland, the proper test to be applied is the "totality of the circumstances." *United States v. Holmes,* 380 A.2d 598, 602 (D.C.App.1977).[8] Applying this test to the instant case, we find that the trial court did not commit clear error by finding that the appellant voluntarily agreed to return to the District.

---

**6.** The fact that Officer Edgar failed to inform the appellant that he did not have to go to the station does not affect the voluntariness of appellant's decision. *Cf. Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (failure of police officer to tell driver he didn't have to consent to a search of his car does not invalidate the driver's consent).

**7.** Even though the Maryland police did not arrest appellant, it should be noted that they had probable cause to arrest. The appellant was operating a motor vehicle with either his license or registration, but not both, this fact combined with the condition of the car, *see note 3, supra,* would give a prudent police officer reasonable grounds to believe that the appellant was not the legal owner of the car.

**8.** *Holmes* is distinguishable from the present situation because of the extremely coercive atmosphere engendered by the police in *Holmes.* In that case, the defendant, upon alighting from a bus in the District, was immediately surrounded by a half-dozen armed officers. More police appeared as Holmes was handcuffed and placed in the back of a Prince George's County police cruiser; he was then "whisked from the bus stop" to a Maryland police station where he was stripped and intensively interrogated.

The record shows that the appellant directed the detectives to the area where his car was located, that he then drove alone in his own car to the gas station,[9] that once at the station, he agreed to go wherever the detectives wished as long as he didn't have to drive, that the appellant himself made arrangements to leave the car at the gas station, and that he aided the detectives in getting back to the District by supplying directions. The appellant was not handcuffed or otherwise restrained during the entire trip.

Upon these facts, we may not fairly conclude that the trial court was clearly wrong in finding that appellant was not arrested in Maryland and that he voluntarily returned to the District. Thus, we affirm these findings by the trial court, so we need not address appellant's argument that the police violated his constitutional rights by not affording him an extradition hearing, since such a procedure is applicable only to persons who have in fact been arrested.[10]

## II–AUTO SEARCH—PLAIN VIEW

Appellant's second argument is that the trial court erred in admitting the green blanket seized from the back floor of appellant's car, because it was obtained through a warrantless search which was not justified by the plain view doctrine. Appellant argues that the seizure did not comply with the requirements of plain view, because there was no prior justification for Forbes' intrusion into the car, nor was the blanket discovered inadvertently, since Forbes' sole

purpose for going to the car was to retrieve the blanket.

The trial court found that the green blanket was admissible under the plain view doctrine. This finding, however, is not clearly sustained by the record.

■ It is a well established principle of criminal procedure that any search or seizure conducted without a warrant is *"per se* unreasonable under the Fourth Amendment—subject only to a few well-delineated exceptions." See *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (consent exception); *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (plain view exception); *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970) (automobile exigency exception); *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) (hot pursuit exception). One of the judicially recognized exceptions to the warrant requirement is the plain view doctrine. This doctrine, however, will justify a warrantless search only when three requirements are met: the police officer must be lawfully present at the situs of the search and seizure, his discovery of the evidence must be inadvertent, and the items seized must be immediately recognizable as evidence. See *Coolidge v. New Hampshire, supra,* 403 U.S. at 468, 91 S.Ct. 2022 (1971); *Brooks v. United States, supra* at 1305. As appellant points out, the seizure of the green blanket did not completely satisfy these requirements. The appellant, how-

9. *Cf. Beckwith v. United States,* 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976) (one of the factors utilized by the court in finding that the appellant acted voluntarily and was not under arrest was that he drove his own car to his office while the agents followed in theirs).

10. See *Md.Code Ann.* Art. 41 § 25 (Repl. ed. 1978) (a person *arrested* in Maryland cannot be delivered to the agents of another state unless he is first brought before a judge who shall inform him of the crime with which he's charged, his right to counsel . . .). If we *had* found that an arrest was made while appellant was in Maryland, we would have applied Maryland's law in respect to extradition because the legality of an arrest must be determined by the law of the jurisdiction in which

the arrest was made. See *Hutchinson v. Maryland,* 38 Md.App. 160, 380 A.2d 232 (1977).

On appeal, the appellant urges that his "arrest" in Maryland was illegal because the police failed to abide by the hearing requirement embodied in the *Uniform Fresh Pursuit Act, Md.Code Ann.* Art. 27, §§ 595–601 (Repl. ed. 1976). This issue is not properly before the court because counsel, at the trial level, referred only to the extradition proceedings and made no reference to the *Fresh Pursuit Act.* We note, however, that even if trial counsel had specifically raised this issue, the outcome would not be different since the Act encompasses only those situations in which an out-of-state police officer makes an arrest in Maryland.

ever, misses the target in evaluating the validity of this search by reference to Detective Forbes' actions, because "the time and circumstances of the *discovery* of the evidence—not its subsequent seizure—are determinative." *Brooks, supra* at 1306. (emphasis added).

Thus, we must look to the circumstances of Detective Wood's discovery of the green blanket. Since we have determined that the appellant voluntarily agreed to accompany the detectives back to the District, there can be no argument but that Wood was lawfully present when he observed the green blanket lying on the back floor of the car, as he held the flashlight for appellant. Further, the green blanket was recognizable as evidence since it matched the description of the blanket missing from the victim's home. Wood's discovery of the blanket, however, would seem to run afoul of the inadvertency requirement. If, the "primary purpose of the initial intrusion, or that of a further intrusion subsequent to the arrest, is the gathering of evidence," *Id.* at 1307 n. 15, then the seizure of the evidence is unlawful. In determining the "primary purpose," it is necessary to look to the motivation of the "officers in the activities which unearthed the disputed evidence." *Id.* at 1306–07. Wood, while holding the flashlight for appellant, was not required to close his eyes to avoid seeing any evidence. The record clearly shows, however, that Wood was informed by Officer Edgar that there were two blankets in appellant's car, one in the trunk and one on the back floor. Since Wood had prior knowledge of the blanket on the back floor, the motivating purpose behind his actions could have been to "gather evidence," which is prohibited by the plain view doctrine. *Id.* at 1307 n. 15. *See also Vance v. United States,* 399 A.2d 52 (D.C.App.1979). We need not make any determination as to Wood's motive at this time, however, because we find that the warrantless seizure of the green blanket can be justified by the automobile exception to the warrant requirement.

It has been long recognized that "for the purposes of the Fourth Amendment, there is a constitutional difference between houses and cars." *Chambers v. Maroney, supra,* 399 U.S. at 52, 90 S.Ct. at 1982 (1970). *Accord Cady v. Dombrowski,* 413 U.S. 433, 439, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). This constitutional difference stems from the inherent mobility of automobiles which creates such exigent circumstances that adherence to the warrant requirement is often impossible, as well as from the lesser expectation of privacy attached to one's automobile as opposed to one's home or office. *See South Dakota v. Opperman,* 428 U.S. 364, 367, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). The cardinal requirement of the automobile exigency exception to the warrant requirement is that the police have "probable cause to believe that the car contains articles that the officer [is] entitled to seize." *Chambers, supra,* 399 U.S. at 48, 90 S.Ct. at 1979.

In the instant case, the trial court found that even though appellant was not arrested until he arrived at the D.C. police station, the District police had probable cause to arrest him in Maryland. The court found that Officer Edgar's revelation to Wood about the blankets in the car, combined with Wood's own observation of the green blanket, gave Wood probable cause to arrest the appellant. Since the confluence of these two events gave Wood probable cause to arrest the appellant, probable cause also ripened at this time to allow Wood to seize the blanket, because it matched the description of the one missing from the victim's house and thus was immediately recognizable as evidence. Further, as long as probable cause to search is present, the fact that a search is not undertaken until sometime after probable cause, has ripened, does not invalidate a warrantless search as long as exigent circumstances still persist. *See Cardwell v. Lewis,* 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974).[11]

11. "Exigent circumstances with regard to vehicles are not limited to situations where proba-

ble cause is unforeseeable and arises only at the time of arrest. The exigency may arise at

**920**

There can be no doubt that exigent circumstances still inhered in respect to the appellant's car when Wood sent Detective Forbes to retrieve the green blanket. The car was parked on an open gas station lot, which was easily accessible to the public, the car doors were not locked, and the ignition was punched out, which enabled the car to be started without a key. These circumstances required prompt action on the part of the police, once they realized how critical the green blanket was, because the car could have been easily moved or the evidence easily destroyed by any member of the general public.[12] Thus, the presence of both exigent circumstances and probable cause, coupled with the lesser expectation of privacy which attaches to an automobile, brought the seizure of the green blanket within the automobile exception to the warrant requirement.[13]

### III–AUTO SEARCH—THIRD PARTY CONSENT

Appellant's third argument is that the trial court erred in admitting the white blanket seized from the trunk of appellant's car, because the consent to search given by Mr. Tampers, the husband of the owner of the car, was not a valid third-party consent. Appellant asserts that Mr. Tampers had neither a property interest in appellant's car nor common authority over its use, therefore his consent was not valid and the white blanket should have been suppressed.

The trial court found that Mr. Tampers' consent was sufficient to justify the search

and to sustain the admissibility of the white blanket.

Consent is an exception to both the warrant and probable cause requirements of the Fourth Amendment. Thus, consent which is voluntarily given will validate a search and seizure of property effectuated without a warrant and without probable cause. *Schneckloth v. Bustamonte, supra,* 412 U.S. at 219, 93 S.Ct. 2041 (1973). In order to justify a third-party consent, the government must prove by a preponderance of the evidence that "permission to search was obtained from a third party who possessed common authority over *or other sufficient relationship* to the premises or effects sought to be inspected." *United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974) (emphasis added).

Applying these principles to the instant case, we find that Mr. Tampers' consent to the search of the car registered to his wife was legally sufficient to warrant admitting into evidence the white blanket found in the trunk. When Wood arrived at the Tampers' residence on February 13, 1976, Mr. Tampers, in Mrs. Tampers presence, informed Wood that he had purchased the vehicle in question, had registered it in his wife's name as a gift, that it is "our car," that the registration had never been changed and that he was still responsible for the car. Shortly thereafter, Wood and Mr. Tampers went to the gas station where

any time, and the fact that the police might have obtained a warrant earlier does not negate the possibility of a current situation necessitating prompt police action." *Cardwell, supra* at 595, 94 S.Ct. at 2472 (citations omitted).

**12.** The vulnerability of appellant's car to vandalism was subsequently attested to by Mr. Tampers, who testified that when he saw the car on the gas station lot the upholstery was torn out and the top and the lock of the trunk were broken. (TR I, p. 204).

**13.** The reasonableness of a warrantless search of an automobile has been acknowledged in circumstances similar to the present case where both probable cause and exigent circumstances exist. *See, e. g., Cady v. Dombrowski,*

*supra,* 413 U.S. at 448, 93 S.Ct. 2523 (1973) (search of the trunk of an automobile, which had been towed to a private gas station, was not unreasonable where the officer reasonably believed that the trunk contained a gun, and the trunk was vulnerable to vandalism); *United States v. Alden,* 576 F.2d 772, 776 (8th Cir. 1978) (search of an automobile was reasonable where, after booking the defendant, the police officer returned to defendant's car, which was parked in front of a private house, and conducted a search, because the car contained evidence of a crime, and exigent circumstances existed since the car was parked on a public street in front of the residence of a suspected accomplice).

the appellant had left the car and Mr. Tampers identified it as his and gave Wood consent to search it. These facts gave Wood grounds to reasonably believe that Mr. Tampers' consent to the search was valid. To reach this conclusion, we are not required to resort to legal niceties to make a post-fact determination as to which of the parties had a greater interest in the premises. We hold, rather, that the search was valid because (1) Mr. Tampers had a "sufficient relationship" to the car to authorize the search and (2) there was a substantial basis for the detective's reasonable and prudent belief that his search of the trunk and seizure of the blanket occurred with the consent of one who had "sufficient relationship" to the car. *See Matlock, supra* at 171, 94 S.Ct. 988. To hold otherwise would be an unwarranted extension of the exclusionary rule which is not designed to provide sanctions against the police for technical imperfections, but to deter constitutionally impermissible police conduct.

## IV–STATEMENTS—MIRANDA—VOLUNTARINESS

Appellant's fourth argument is that the statements he made to the Metropolitan Police on January 28, 1976 should be suppressed because they were obtained in an illegal and unconstitutional manner. The trial court suppressed all statements made by appellant prior to his being advised of his *Miranda* rights, finding that Detective Wood's questioning amounted to "custodial interrogation." The court, however, admitted the statements made by appellant subsequent to his exercise of his right to remain silent and his right to counsel, finding that he intentionally waived these rights when he spontaneously began his rambling monologue.[14]

We find that it was reversible error to admit any statements made by appellant, because the method through which they were obtained violated both the prophylactic standards established to prevent compulsory self-incrimination, *see Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), as well as the due process requirement of voluntariness, *see Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

### A. The Miranda Issue

Contesting the admissibility of his statements, appellant first urges this court to consider the adoption of a *per se* rule excluding any confession obtained by police interrogation after an accused has asserted his right to counsel. Appellant next argues that regardless of the merits of a *per se* rule, his statements are inadmissible because the government failed to carry its heavy burden of proving a knowing and intelligent waiver by appellant of his right to counsel. The government argues that there is no ground for such a *per se* rule and asserts that appellant's spontaneous initiation of the discussion shows he intentionally waived his rights.

*Miranda v. Arizona* determined that assistance of counsel should be available to protect a suspect's right against self-incrimination during custodial interrogation and consequently required exclusion of statements obtained from the suspect without properly affording him such assistance.[15] The question inevitably arose in the wake of *Miranda* whether, once having invoked his right to counsel, a suspect can later be further interrogated without counsel present, and if so, what the government must show to prove that the suspect had indeed waived his right to assistance of

---

14. It should be noted that at no time during this monologue did appellant voluntarily broach the subject of Mrs. King's death. At one point, however, Detective Newcomb directed appellant's attention to the homicide asking "Did you kill Mrs. King?", appellant responded in the negative. Newcomb then persisted in his questioning by inquiring "Could one of your

four states of being have committed the homicide?", appellant responded, "Yes, [because] you could not control the force."

15. The Court felt that this right was indispensable to protect a defendant against compulsory self-incrimination. *See Miranda, supra*, 384 U.S. at 469, 86 S.Ct. 1602.

counsel.[16] The Supreme Court has not as yet specifically addressed this question.[17] In *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), however, the court declared that a defendant could possibly waive his right to counsel, but it is incumbent upon the government to prove " 'an intentional relinquishment of a known right or privilege.' " *Id.* at 404, 97 S.Ct. at 1242, *quoting Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

 In *Shreeves v. United States*, 395 A.2d 774 (D.C.App.1978),[18] a situation closely analogous to the case at bar, this court recently interpreted *Brewer* as supporting the view that a defendant may waive his right to counsel once he has asserted it without consulting his attorney. The court declared, however, that when the government attempts to show that a waiver of the right to counsel has been made after such right was once exercised, the govern-ment bears a greater burden than when it attempts to show a waiver of the right to remain silent. This heavier burden requires that the government show: (1) the defendant understood that he had a right to the presence of counsel during an interrogation, and (2) that he intentionally relinquished that known right. *Shreeves, supra* at 781. In deciding whether the government has met this greater burden, the trial court should look to the totality of the circumstances, including the experience, background, and conduct of the defendant, and should make explicit findings of fact as to whether the waiver of counsel was a knowing, voluntary, and intelligent waiver of a known right. *Id.* at 781. Looking to the totality of the circumstances in *Shreeves*, this court affirmed the trial court's findings that Shreeves validly waived his right to the presence of counsel during the police interrogation. The record clearly reflected that prior to the interrogation, the police

**16.** Several federal courts have split on this issue, *compare United States v. Thomas*, 474 F.2d 110 (10th Cir.), *cert. denied*, 412 U.S. 932, 93 S.Ct. 2758, 37 L.Ed.2d 160 (1973) with *United States v. Springer*, 460 F.2d 1344 (7th Cir.), *cert. denied*, 409 U.S. 873, 93 S.Ct. 205, 34 L.Ed.2d 125 (1972).

**17.** In *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), the Court found that *Miranda* did not create a *per se* proscription upon any further questioning of a defendant after he invoked his right to remain silent. The Court held that the admissibility of a statement obtained after a person in custody has decided to remain silent depends on whether his "right to cut off questioning was scrupulously honored." *Id.* at 104, 96 S.Ct. at 326. Crucial factors entering into determination of whether a defendant's right was "scrupulously honored" are whether the defendant was re-advised of his *Miranda* rights prior to the renewed interrogation, the length of time which has elapsed between his invocation of his right to remain silent and the re-institution of the questioning, and whether the subsequent questioning pertained to the same crime about which he had been previously questioned. The *Mosley* Court specifically did not address the propriety of later questioning a defendant who had asserted his right to consult with an attorney. *See id.* at 101, n. 7, 96 S.Ct. 321.

In *North Carolina v. Butler*, — U.S. —, 99 S.Ct. 1755, 60 L.Ed.2d 286 (April 24, 1979), the Supreme Court addressed a situation where the appellant had stated he would talk to the F.B.I. and had not requested counsel. Given those circumstances, the Court refused to accept a *per se* rule which would require an explicit statement for a valid waiver of the right to counsel. Instead, the Court stated that in some cases waiver can be clearly inferred from the actions and the words of the person interrogated, depending on his level of understanding and his course of conduct. *Id.* at —, 99 S.Ct. 1755. *Butler* is not applicable to the present case, because, as will be shown *infra*, neither appellant's understanding nor his course of conduct indicated an implied waiver, especially in light of the fact that appellant, unlike Butler, requested the presence of an attorney.

**18.** The appellant in *Shreeves* was tried by a jury in a bifurcated trial and found guilty of felony murder, second degree murder, and armed robbery, the jury rejected his insanity defense in the second phase of the trial. On appeal, appellant claimed his Sixth Amendment right to counsel was violated by the use of statements obtained through a police interrogation conducted without the presence or consent of his attorney. The record showed, however, that Shreeves, unlike the appellant in the instant case, had counsel appointed to represent him and had consulted with counsel prior to the day of interrogation. The record further reflected that the police officer who questioned Shreeves had spoken with Shreeves' attorney about the possibility of interviewing Shreeves, and the attorney indicated to the officer that the decision whether to talk was Shreeves'. *See Shreeves, supra* at 778 n. 4.

officer twice informed Shreeves of his *Miranda* rights, and asked him whether he wanted to have his attorney present. The record further reflected that Shreeves did not wish to confer with his attorney and that he consented to being interrogated without the attorney present.

 Applying these standards to the case at bar, we find that the government failed to satisfy its great burden of showing that appellant, without the presence of an attorney, knowingly waived his privilege against self-incrimination and his right to retained or appointed counsel. *See Miranda, supra,* 384 U.S. at 475, 86 S.Ct. 1602. Looking to the totality of the circumstances, appellant, unlike Shreeves, was requestioned before even being given the opportunity to consult counsel. This requestioning not only impaired appellant's right to assistance of counsel, but it also effectively frustrated his right to remain silent because no attorney was present to mitigate the coercive custodial atmosphere which "can operate very quickly to overbear the will of one made aware of his privilege by his interrogators." *Id.* at 469, 86 S.Ct. at 1625. Further, the record here does not reflect any extensive findings of facts as to an intentional and knowing relinquishment. *See Shreeves, supra* at 781. Rather, the trial court concluded that because appellant had signed the PD 47 form refusing to waive his rights, he had evidenced a clear understanding of his rights. Thus, when he began to speak, he voluntarily waived those rights. The evidence showed however, that appellant was not re-advised of his *Miranda* rights before Newcomb began to question him, and Newcomb did not ask appellant whether he wanted an attorney present or was waiving such right. Finally, appellant's conduct, which we address in the next section, indicates that he did not possess sufficient capacity to make a knowing and intelligent waiver, for a waiver requires

"not only comprehension but relinquishment. . . ." *Brewer, supra* 430 U.S. at 404, 97 S.Ct. 1232. Given these circumstances, we conclude that appellant's statements should have been suppressed.

### B. *The Voluntariness Issue*

We further conclude that even if the *Miranda* requirements were strictly adhered to, appellant's statements must still be suppressed because they were elicited in a manner which violated the due process requirement of voluntariness.

 The use of an involuntary confession against a defendant deprives that defendant of due process regardless of the truth or falsity of that confession. *Jackson v. Denno, supra,* 378 U.S. at 376, 84 S.Ct. 1774. When a defendant objects to the use of his confession, claiming it was the product of coercion, he has a constitutional right to "have a fair hearing and a reliable determination on the issue of voluntariness . . . ." *Id.* at 377, 84 S.Ct. at 1781.[19] This hearing shall be conducted by the trial judge outside the presence of the jury and the judge shall determine the issue of voluntariness uninfluenced by the veracity of the statements. *See, e. g., Luck v. United States,* 121 U.S.App.D.C. 151, 348 F.2d 763 (1965). Throughout the course of this hearing, the government has the burden of proving by a preponderance of the evidence that the defendant's statements were voluntary. *Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); *Hawkins v. United States,* 304 A.2d 279, 282 (D.C. App.1973). A defendant's statement shall be deemed voluntary if the totality of the circumstances show it to be the "product of an essentially free and unconstrained choice by the maker." *Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961) (quoted in *Schneckloth v. Bustamonte, supra,* 412 U.S. at 225–26, 93

---

**19.** The appellant argues that even if the evidence introduced at the pretrial hearing was insufficient to establish the involuntary character of his statements, the trial court was required *sua sponte* to consider the evidence pertaining to appellant's mental illness as proba-

tive of the involuntariness of the statement. We need not reach this issue, however, since we find that there was sufficient evidence to show that appellant's statements were not voluntary.

S.Ct. 2041). When determining the voluntariness of a defendant's statements as mandated by *Jackson v. Denno,* all relevant circumstances must be taken into account such as physical abuse, *Brown v. Mississippi,* 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936); nighttime interrogation, *Greenwald v. Wisconsin,* 390 U.S. 519, 88 S.Ct. 1152, 20 L.Ed.2d 77 (1968); incommunicado detention, *Davis v. North Carolina,* 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966); the defendant's lack of education, *Culombe v. Connecticut,* 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); his emotional instability, *Spano v. New York,* 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959); and his limited mental capacity, *Sims v. Georgia,* 389 U.S. 404, 88 S.Ct. 523, 19 L.Ed.2d 634 (1967). It is thus axiomatic that the "accused's mental condition is one of the factors bearing on the admissibility" of his confession. *Green v. United States,* 128 U.S.App.D.C. 408, 389 F.2d 949 (1967). Once the trial judge has reached a determination as to the voluntariness of a defendant's statement, his conclusion will not be overturned unless it was without substantial support in the evidence. *Taylor v. United States,* 380 A.2d 989, 992 (D.C.App. 1977).

In the case at bar, there was sufficient evidence to show that the defendant was mentally ill at the time of his confession. Appellant had a history of mental illness, Detective Wood testified at the suppression hearing that his observation of appellant during the interrogation led him to believe that appellant was mentally ill and in need of hospitalization, and the trial judge himself declared that appellant's statements showed him to be irrational. In addition, Dr. Irwin Papish testified that, in his opinion, it was more likely than not that appellant was suffering from paranoid schizophrenia at the time he made the statements. The trial court rejected Dr. Papish's testimony as insufficient to show involuntariness, because the doctor expressed no medical certainty with respect to appellant's condition at the time the statements were made.

The government urges affirmance of the trial court's conclusion, claiming that Dr. Papish's testimony, even in addition to the other evidence, failed to show that appellant's statements were not voluntary. Both the trial court and the government, however, have misinterpreted the standards to be applied in determining the voluntariness and the admissibility of a defendant's statements. As this court has stated, the government has the burden of proving by a preponderance of the evidence that a defendant's statements were voluntary. *Hawkins v. United States, supra* at 282. Further, even where it is only *probable* that the defendant was mentally ill at the time the statements were made, such statements must nonetheless be suppressed, because "our system of law enforcement should not operate so as to take advantage of a person in this fashion." *Blackburn v. Alabama,* 361 U.S. 199, 207, 80 S.Ct. 274, 280, 4 L.Ed.2d 242 (1960). Here, there was compelling evidence to show that appellant was mentally ill at the time of his statements: his history of mental illness, the incoherent nature of his statement, the testimony of Detective Wood and Dr. Papish, and the trial court's acknowledgement of the irrationality of appellant's statement.

In addition to this compelling evidence of mental illness, several other factors combine to demonstrate the involuntariness of appellant's statements. Appellant was in the company of police officers for six and one-half hours, and in custody since 11:00 P.M. He was subjected to late night interrogation, which alone may make a confession involuntary. *See, e. g., Greenwald v. Wisconsin,* 390 U.S. 519, 88 S.Ct. 1152, 20 L.Ed.2d 77 (1968); *Haley v. Ohio,* 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948). He was questioned in isolation, cut-off from family, friends, and the advice of counsel, and his discussion about the homicide was not spontaneous but was elicited by the interrogation of Detective Newcomb.

The totality of these circumstances, combined with appellant's mental illness, show that the trial court's conclusion that appel-

lant's statements were voluntary[20] lacks substantial support in the evidence. *Taylor v. United States, supra* at 992. Thus, the admission of these statements into evidence violated appellant's right to due process of law, and is reversible error.

### V–BIFURCATION—JURY SELECTION

Appellant's fifth argument is that the trial court committed reversible error by denying the joint request of the government and the defense for a separate voir dire of the jury panel before the insanity phase of the trial.

■■■■■ The concept of bifurcated trials arose from the realization that "substantial prejudice may result from the simultaneous trial on the pleas of insanity and not guilty." *Holmes v. United States,* 124 U.S. App.D.C. 152, 153, 363 F.2d 281, 282 (1966). The aim of a bifurcated trial is to mitigate the possibility of such prejudice by separating as much as possible the issue of mental responsibility from the factual elements of the accused's conduct. *See United States v. Taylor,* 167 U.S.App.D.C. 62, 510 F.2d 1283 (1975). The decision of whether to bifurcate rests within the sole discretion of the trial judge, and no abuse of discretion will be found in denying the bifurcation, unless the defendant proffers a "substantial claim" for the necessity thereof. *See Harris v. United States,* 377 A.2d 34 (D.C.App. 1977); *Shanahan v. United States,* 354 A.2d 524 (D.C.App.1976). The court not only has a broad discretion in considering bifurcation, but also in prescribing its procedure. *Holmes v. United States, supra,* 124 U.S. App.D.C. at 154, 363 F.2d at 283.[21] The procedure adopted, however, must effectuate the purpose of bifurcation by guarding against two types of prejudice inherent in a unitary trial involving insanity: (1) preju-dice to a defendant's insanity defense arising from the evidence on the merits, and (2) prejudice to a defendant's defense on the merits arising from the insanity evidence.

■■■■ In the case at bar, the trial court's decision to bifurcate determined, as a matter of law, that appellant could not have a fair trial if the issues of guilt and insanity were presented to the jury simultaneously. We must now review the record again to determine, if after granting bifurcation, the court abused its discretion in the procedure it prescribed. We decide that it did.

Appellant proffered that the nature of the insanity defense would be extensive and comprehensive. The evidence as to insanity would evolve from the testimony of six psychiatrists, each of whom would testify that they found appellant to be mentally ill and that the crime, if committed by him, was a product of his mental illness. Appellant also proffered the testimony of three police officers that in their opinion, based upon their observations of appellant's conduct, appellant was mentally ill. A discussion of the evidence revealed that the defense's serious challenge to the government's circumstantial evidence would give rise to a substantial jury question as to whether, in fact, appellant committed the crime. Counsel asserted that the proffered testimony concerning insanity was highly relevant to that issue but not to a defense on the merits, and to introduce it during the guilt phase would severely prejudice the jury because of the inflammatory character of the evidence. The court, in a proper exercise of discretion fully supported by the record, granted bifurcation and implicitly found that the defendant had proffered a "substantial claim" for the necessity thereof. By refusing, however, to conduct a separate voir dire at the beginning of the

---

**20.** The trial court did not make an explicit finding as to the voluntariness of appellant's statements. However, the court's rulings that appellant's statements were spontaneous and veiled allusion to the homicide, and that Dr. Papish's testimony was insufficient to show that appellant was mentally ill at the time the statements were made, are indicative of an implicit finding of voluntariness.

**21.** *See also* Sup.Ct.Cr.R. 57(b).

**PROCEDURE NOT OTHERWISE SPECI-FIED.** If no procedure is specifically prescribed by rule, the court may proceed in any lawful manner not inconsistent with these rules or with any applicable statute.

insanity phase, the court exposed appellant to the dual dangers which bifurcation seeks to obviate: prejudice to both appellant's defense on the merits and his insanity defense arising from the inability of a jury to disassociate the appellant's factual guilt from his mental responsibility. The substantial prejudice to the appellant, which resulted from this refusal, is apparent from the "Catch–22" position into which defense counsel was placed: he could probe the jurors about their attitudes toward insanity prior to trial on the merits and incur virtually certain severe prejudice to his client's defense on the merits by indicating to the jurors that an additional, inconsistent defense was yet to come; or he could forego voir dire on this issue entirely and be unable to assure that impanelled jurors were not biased with respect to the insanity defense. In essence, the refusal to permit separate voir dire negated the very purpose for granting a bifurcated trial.[22] The court further eroded the protections which bifurcation should have afforded to the appellant when it questioned the potential jurors about their opinions on the defense of insanity, prior to the guilt phase of the trial.[23] By injecting the issue of insanity at this stage, the court fatally prejudiced the appellant's defense on the merits because the jury, aware of a possible insanity defense, "will tend . . . believe that (appellant) did the act," *Holmes, supra* 124 U.S. App.D.C. at 153, 363 F.2d at 282, and could rely on this belief to piece together the evidentiary puzzle presented by the government.

*Reversed and remanded for a new trial.*

**22.** *See Kleinbart v. United States,* 388 A.2d 878, 879 n.2 (D.C.App.1978).

**23.** And still further by requiring the introduction of six doctors, who naturally were not called to testify before the jury determined the guilt phase.