**Michael N. KLEINBART, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 11932.**

District of Columbia Court of Appeals.

Argued March 15, 1979.

Decided Jan. 30, 1981.

Nicholas D. Dale, Washington, D. C., appointed by this court, for appellant.

William J. Birney, Asst. U. S. Atty., Washington, D. C., for appellee. Earl J. Silbert, U. S. Atty., Washington, D. C., at the time the brief was filed, John A. Terry

and Michael L. Lehr, Asst. U. S. Attys., Washington, D. C., were on brief, for appellee.

Before GALLAGHER and MACK, Associate Judges, and YEAGLEY, Associate Judge, Retired.

YEAGLEY, Associate Judge, Retired:

On July 1, 1975, appellant was charged in an indictment with first degree murder while armed (D.C.Code 1973, §§ 22–2401, –3203), first degree murder D.C.Code 1973, § 22–2401), and carrying a pistol without a license (D.C.Code 1973, § 22–3204). At his first trial, the jury was unable to reach a verdict on the two murder counts and a mistrial was declared, but he was found guilty on the weapons charge, which was subsequently reversed by this court in *Kleinbart v. United States*, D.C.App., 388 A.2d 878 (1978).[1]

When appellant was retried, the jury found him guilty of first degree murder while armed. He was sentenced to 20 years to life and this appeal followed. Appellant urges numerous grounds for reversal. For the reasons which follow, we remand for a hearing to determine whether exculpatory material existed which was suppressed in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and for trial on the insanity defense. The evidence on which the conviction was based may be summarized as follows:

On the afternoon of May 16, 1975, appellant's wife, Gladys Kleinbart, was in a local restaurant when Tyrone Bennett, the deceased, entered the restaurant and slapped her twice because "she had got into his business." Mrs. Kleinbart threatened to have him put in jail and Mr. Bennett left.

Mrs. Kleinbart was very upset about the incident and told her husband about it later. Meanwhile Mr. Bennett was angry because of the threat that Mrs. Kleinbart would have him locked up. Bennett made various threats against appellant to third persons and word got back to appellant that Bennett was "out to get him." Appellant went to a friend's apartment to retrieve a gun he had loaned to the friend, allegedly because he had been advised to protect himself against Bennett.

On May 17, appellant and his wife returned to the restaurant. Margaret Teano and Thomas Butler, acquaintances of both appellant and the deceased, were also there. Ms. Teano testified that she noticed appellant had a gun on him. Appellant told her that his wife would not have Bennett put in jail, but that Bennett should not have hit her. He asked Ms. Teano where Bennett was (she did not know) and told her to tell Bennett he was looking for him. Ms. Teano then borrowed Butler's car and left the restaurant. At the same time appellant and his wife left in a taxi with three other people. Ms. Teano drove to the corner of 8th and M Streets, where she saw Bennett, who started to walk toward her car.

Appellant also had driven to this corner. His wife, seeing Bennett, shouted "there he is" and appellant fired a shot. (He testified that it was a shot in the air to scare Bennett). Bennett yelled to Ms. Teano "give me the shotgun" and made a motion toward the car while Ms. Teano opened the car door and reached toward him. Appellant then fired a second shot, which hit and killed Bennett.

### I. Pro Se Defense

After appellant's first trial,[2] he filed a motion on April 21, 1976 to proceed pro se before Judge Norma Johnson, and requested that Mr. Warren Nighswander be permitted to assist in his retrial scheduled for April 26th. On April 22nd, Mr. Nighswander sought a continuance for additional time to prepare for trial. During the hearing on the two motions, appellant informed the court that he had retained another attorney, and that if that attorney was un-

---

1. At appellant's first trial his pretrial motion to have a bifurcated trial on the issue of insanity was granted, but the jury ultimately rejected that defense.

2. Warren Nighswander and Robert Muse, both from the Public Defender Service, represented appellant throughout his first trial.

able to provide representation, he would seek to continue pro se.

On April 26th, when the case was called for trial, Mr. Shorter, appellant's retained counsel, informed the court that he was unable to represent appellant and the motion to proceed pro se was renewed. A hearing was set for May 11, at which time appellant filed another motion for permission to choose his own court-appointed attorney or, in the alternative, to represent himself with Mr. Nighswander's assistance. The court denied the first motion, but granted the latter, and appointed Mr. Nighswander as amicus curiae.

Appellant, at another pretrial hearing on June 9th asked the court to appoint a Mr. Lewis Kleinman, retained by appellant's sister, to act as co-counsel for appellant. A further hearing was scheduled and Mr. Muse, defense counsel at the first trial, was permitted to withdraw.[3]

In September, the case was re-assigned to Judge Nunzio, who appointed Mr. Robbins as counsel for appellant. It was at appellant's first status hearing before Judge Nunzio that the court advised him that it would "look to" the attorney. Appellant filed a "Motion to Continue Defendant as Counsel" and later wrote two letters, received November 11th and 17th, in which he complained that he had not yet heard from Mr. Robbins. Meanwhile, Robbins made a motion to the court requesting clarification of his duties with respect to appellant's representation. The court's Order in response thereto stated:

> It further appears that the basis of the defendant's claim for self-representation lies in his belief that he is most qualified to litigate the factual aspects of his defense. In light of this belief, the Court will allow the defendant as much latitude in his self-representation in this area as

the rules of evidence and the interests of justice allow.

The court directed that:

> 1. Mr. Robbins shall represent the defendant at all purely legal proceedings, such as pretrial conferences, bench conferences, *voir dire*, and jury selection.
> 2. Mr. Robbins shall raise all evidentiary objections during the course of trial.
> 3. All future pleadings by the defense shall be filed by and through Mr. Robbins to insure compliance with the rules of the Court.

On December 16, 1976, appellant filed a "Motion to Vacate Order Denying Pro Se Right" and on December 29, a "Motion to Withdraw Counsel," in which appellant claimed dissatisfaction with Mr. Robbins' appointment and performance. The court denied both motions.

Prior to trial, the court directed (1) that appellant conduct all examinations from behind counsel table; (2) that appellant file all evidentiary objections in writing at the conclusion of trial;[4] and (3) that Mr. Robbins alone participate in bench conferences during trial.

Appellant filed two more motions prior to trial in which he objected to Mr. Robbins' participation. However, the objections were not renewed when trial commenced on January 12, 1977.

■ Appellant cites numerous isolated comments from the bench in an attempt to support his allegation of denial of appellant's constitutional right to self-representation. He points specifically to the appointment of Mr. Robbins, claiming he was more than mere "standby counsel," and to the court-imposed limitations on his own trial participation as unconstitutional deprivations. However, after a review of the entire transcript, we find that appellant

---

**3.** Apparently Mr. Muse and Mr. Nighswander were at this point both relieved from representation. The record is somewhat unclear because of the confusion caused by the appearance of so many attorneys.

**4.** Under Super.Ct.Cr.R. 51, a party cannot be prejudiced by his failure to make objection if

he lacks an opportunity to do so. The analogous federal rule is designed to allow both the court and counsel to take appropriate corrective action. *United States v. Walker*, 146 U.S. App.D.C. 95, 97 n.6, 449 F.2d 1171, 1173 n.6 (1971).

was indeed permitted to present "his defense." *Faretta v. California*, 422 U.S. 806, 821, 95 S.Ct. 2525, 2534, 45 L.Ed.2d 562 (1975). We recognize that any violation of the defendant's right to pro se representation, based as it is upon the Sixth Amendment right to counsel, requires reversal as presumptively prejudicial. *Faretta v. California, supra* at 836, 95 S.Ct. at 2541. *See Jackson v. United States,* D.C.App., 420 A.2d 1202 (1979).

Several weeks before trial, Faretta "clearly and unequivocally declared" to the trial court his desire to represent himself. *Id.* at 836, 95 S.Ct. at 2541. The record revealed that he was "literate, competent, and understanding, and . . . voluntarily exercising his informed free will." *Faretta v. California, supra*. Nevertheless, the trial court forced the defendant to "accept against his will a state-appointed public defender," and "required that Faretta's defense be conducted only through the appointed lawyer. . . ." *Id.* at 811, 95 S.Ct. at 2529. Faretta was thus deprived of his constitutional right to present any of "his [own] defense."

However, in *Faretta* at 836 n.46, 95 S.Ct. at 2541 n.46, the Supreme Court explicitly condoned an appointment, even over a defendant's objection, of a stand-by counsel to "aid the accused if and when the accused requests help," citing *United States v. Dougherty*, 154 U.S.App.D.C. 76, 87–89, 473 F.2d 1113, 1124–26 (1972), as an example. In *Dougherty, supra,* the court denied motions of the nine codefendants for pro se representation. The court required that motions, objections, and examination of witnesses be made through counsel. It did, however, agree to permit each defendant to make a five-minute opening statement and to testify in narrative form at reasonable length without a specific time limit. *Dougherty, supra* at 82, 473 F.2d 1113. Thus, the circuit addressed the question "as to whether the overall format of the trial was such, in terms of the latitude given to the defendants, that they in effect had the substance though not the form of pro se representation," *id.* at 92, 473 F.2d 1113, but found that "[t]he court's indulgence of defendants undoubtedly appeared as exactly that, a matter of grace—as something 'extra' given to them beyond their due rights—which undercuts the objective of preserving defendant's personal autonomy and responsibility in the courtroom." *Id.* at 92, 473 F.2d 1113.[5] Judge Nunzio, on the other hand, made it abundantly clear from the outset, and reminded the jury frequently that Mr. Kleinbart was acting as his own attorney and permitted him a substantial measure of active participation.

Appellant argues that standby counsel's role is thus limited to the extent that the defendant wishes to avail himself of the attorney's services. Mr. Robbins, he claims, actually served as co-counsel, apparently because of the amount of "representation" he afforded appellant. The record is replete with instances of consultation between the two, without any apparent interference or coercion by the court.

Appellant assigns as error the court's directives that Mr. Robbins, against appellant's wishes, represent him at all "purely legal proceedings, such as pretrial conferences, bench conferences, voir dire, and jury selection, in raising evidentiary objections, and in filing all pleadings." Appellant's contentions, however, are not supported by the record. We will address each briefly seriatim.

First, in regard to appellant's claim that he was denied the right to act pro se, we note that appellant made both opening and closing statements to the jury, conducted an extensive examination of each witness and testified himself in narrative form. Additionally, he was permitted to make motions and objections, and to participate in all of the pretrial conferences and most of those held during the trial. His attorney made numerous evidentiary objections and participated in bench conferences, sometimes to a

---

5. The court in *Dougherty* concluded that the trial judge allowed brief opening statements by defendants "not as representing themselves, as they had a right to appear, but as a supplement" to their appointed counsel.

limited extent, when his client was present, and advised appellant on the frequent occasions that he sought help.

Appellant cites 12 instances in which a bench conference during trial was held in which Mr. Robbins participated and appellant was excluded. Three of those resulted in rulings adverse to appellant: (1) the trial court refused to give an impeachment instruction; (2) the trial court admitted photographs of the crime scene into evidence; and (3) the trial court overruled appellant's objection to a propounded prosecution question regarding the place where appellant had first met one witness. These three isolated rulings alone in a trial that lasted several days are not sufficient to support appellant's contention that the trial court denied him his right to pro se representation.

Appellant also argues that during the voir dire, appellant was restricted from participation in the questions propounded from the bench. However, the court performed the questioning itself, and then gave Mr. Robbins time to relate to appellant the prospective jurors' answers. In fact, the judge conducted the entire voir dire himself. It is unclear from the record whether Mr. Robbins or appellant exercised the defense strikes, however, there were no restrictions on appellant in that function.

Each of appellant's written objections, submitted at the end of his trial, were considered by the court and are separate issues presented in this appeal. In each case, Mr. Robbins noted an objection for the record.

■ Finally with regard to the directives for filing defense pleadings, the following colloquy took place:

THE COURT: I'm not going to take anything [pleadings] from you because you have a lawyer now. If he approves . . . let him redo it and I'll receive it from him. You're working together.

MR. KLEINBART: I can't file anything with the Court?

THE COURT: I'll take it. It will be filed, but I want him to either adopt it or not, it's improper and redo it. Anything

you have there, I'll accept, but I'm not going to rule on it if I'm not satisfied. The basis for the ruling was to insure compliance with the procedural rules of the court, which are binding on pro se defendants. *See Faretta, supra* at 834, n.46, 95 S.Ct. at 2541 n.46.

■ Appellant has tried to make a forceful argument on this issue, but a reading of the record reveals that he had almost complete leeway and was in control of his own defense but for the few exceptional areas we have noted, which may properly be reserved to counsel. We conclude that appellant was not deprived of his right to act pro se.

## II. *Cross-examination of Appellant*

On cross-examination, the prosecutor questioned appellant regarding his failure to produce his wife, Gladys Kleinbart, who had been an eyewitness to the shooting incident. Appellant responded that she was not capable of testifying because she was sick and under psychiatric care. The questioning was proper up to this point. *United States v. Free*, 141 U.S.App.D.C. 198, 202–03, 437 F.2d 631, 635–36 (1970); *Stevens v. United States*, 115 U.S.App.D.C. 332, 334, 319 F.2d 733, 735 (1963). However, the prosecutor thereafter attempted to impeach appellant through the use of an extra-judicial statement made by Mrs. Kleinbart. He asked appellant whether the real reason for his failure to call his wife to testify was that the contents of the statement, impliedly unfavorable to the defense, would come into evidence for purposes of impeaching her. The questioning went as follows:

Q: Isn't that [Mrs. Kleinbart's statement] the reason why you didn't call her?

A: No. This statement, this statement is totally in my favor.

Q: I see. Is there someplace in that statement where she says you acted in self-defense?

\*   \*   \*   \*   \*   \*

[Over Mr. Robbins' objection, before the court had ruled, appellant answered the question.]

A: Gladys is not responsible for what she says or does. That's the reason I didn't put her here. She may not even understand an oath. I don't know what Gladys might say.

\* \* \* \* \* \*

[The question was repeated.]

A: She says a lot of things in this statement that ain't true. You know, she might say anything. She is sick.

▪ We find this use of the prior allegedly inconsistent statement of Mrs. Kleinbart to be improper. *United States v. Dye*, 508 F.2d 1226, 1234 (6th Cir. 1974), *cert. denied*, 420 U.S. 974, 95 S.Ct. 1395, 43 L.Ed.2d 653 (1975). However, we hold that the error was harmless for several reasons. First of all, the substance of the statement did not reach the jury. *See id.* Second, appellant, acting pro se, waived Mr. Robbins' objection to the propounded question by volunteering an answer. Third, we find that appellant ably countered the attempted impeachment. The jury was left with a favorable inference of the contents of the statement, uncontradicted by the government, which outweighed the prosecutor's initial implication. No prejudice resulted from this cross-examination sufficient to constitute reversible error. *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946).

### III. *Missing Witness Inference*

In the course of appellant's trial, the court was informed by a marshal that during a recess, Mrs. Kleinbart (appellant's wife) had spoken to a juror in a restroom. Shortly after the occurrence, this juror described the encounter to a fellow juror. According to the first juror, appellant's wife had said: "My husband is on trial. Plead him innocent because he is insane, on insanity charges."

After striking these jurors from the panel, the court engaged Mrs. Kleinbart in an extended colloquy during which she stated that she was not a witness in the case and that she was under psychiatric care. The court reprimanded her for "trying to intimidate other jurors in the case" and ordered her from the courthouse. After she denied having talked to the jurors, the court said: "Mrs. Kleinbart, you are a sick woman." The court then repeated the order to stay away and the trial continued.

When the government requested a missing witness instruction on Mrs. Kleinbart, the defense objected. The court denied the instruction but allowed the matter to be argued to the jury. The defense position was that Mrs. Kleinbart could not supply any material evidence that had not been presented and considering her nonavailability, it was improper to allow the government to argue the inference. In response, the court stated:

Mr. Robbins, she could successfully have made testimony under various theories of privilege. It was his statement on the stand that she was under psychiatric care, but wouldn't help. But she was present through the whole thing, and I will permit him to argue. But I won't instruct.

Appellant contends that the government's closing argument, which called to the jury's attention the failure of his wife to testify and asked the jury to draw inferences adverse to him from her absence, was error. We agree. In pertinent part, that argument was as follows:

Ladies and gentlemen, there was one witness who didn't testify in this case, and she was in the taxicab. And that was Mr. Kleinbart's wife, and we can't make her testify. She didn't testify in this case, but Mr. Kleinbart and everybody testified that she spotted Tyrone Bennett first.

She should have seen what he did. She should have seen if he went for a gun. If Mr. Kleinbart shot him in self-defense he could have trotted her right up there on the stand and had her tell us about it. She was watching the whole time, but you didn't hear her testify, and Mr. Kleinbart didn't choose to put her on the witness stand. And why do you suppose that?

In a recent decision of this court, addressing a similar claim that the government inappropriately argued the missing witness inference, we discussed at length the origin of and rationale for the missing witness inference. We stated:

Over eighty years ago, the Supreme Court enunciated a rule that "if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable." *Graves v. United States*, 150 U.S. 118, 121 [14 S.Ct. 40, 41, 37 L.Ed. 1021] (1894). The rule is still followed in the District of Columbia. *See, e. g., Coombs v. United States*, D.C.App., 399 A.2d 1313 (1979). The two criteria that must be present before the jury may be invited to infer that the testimony of an absent witness would have been adverse to a party are (1) that the witness is peculiarly within the power of the party to produce, and (2) that the witness' testimony is likely to elucidate the transaction in issue. If either condition is not present then "[b]oth comment by counsel and instruction by the judge . . . is prohibited." *Conyers v. United States*, D.C. App., 309 A.2d 309, 312–13 (1973). [*Dent v. United States*, D.C.App., 404 A.2d 165, 169–70 (1979).]

*See also Dyson v. United States*, D.C. App., 418 A.2d 127 (1980). In *Dent, supra* at 171 n.6, we quoted the rule of *Gass v. United States*, 135 U.S.App.D.C. 11, 19–20, 416 F.2d 767, 775–76 (1969), which this court has also required. *Fleming v. United States*, D.C.App., 310 A.2d 214, 220 (1973); *Conyers v. United States*, D.C.App., 309 A.2d 309, 312–13 (1973). The trial court must make a factual determination that the two previously discussed conditions are met and second, if such argument is to be permitted, an appropriate jury instruction should be given on the proper use of the adverse inference.[6] *See Dent, supra* at 171, and cases cited therein.

■■■ Appellant also contends that the improper missing witness argument served to cancel the marital privilege.[7] In *Trammel v. United States*, 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980),[8] the Supreme Court modified the federal rule of *Hawkins v. United States*, 358 U.S. 74, 77, 79 S.Ct. 136, 138, 3 L.Ed.2d 125 (1958), which had barred the testimony of one spouse against the other unless both consent. In the words of the Court, "this modification-vesting the privilege in the witness spouse furthers the important public interest in marital harmony without unduly burdening legitimate law enforcement needs." *Trammel, supra* at 914.

In our case, the court denied the instruction but then permitted the government to argue the failure of appellant to have his wife testify as to her availability. We cannot say whether she would have exercised her privilege and we don't know if the court would have determined that she was competent to testify. Since the court had refused the instruction and had not made a finding as to her availability, it was error to have permitted the argument.[9]

---

6. The court, nevertheless, has discretion to deny adversary comment on the absence of the witness despite a finding that both conditions are satisfied, "on the theory that the rule need not be applied broadly or rigidly." *Dent, supra* at 171; *Burgess v. United States*, 142 U.S.App. D.C. 198, 205, 440 F.2d 226, 233 (1970).

7. D.C.Code 1973, § 14–306 provides in pertinent part: (a) In . . . criminal proceedings, a husband or his wife is competent but not compellable to testify for or against the other.

8. Prior to trial on federal drug charges, Trammel advised the District Court that the government intended to call his wife (who had been named in the indictment as un unindicted co-conspirator) as an adverse witness and asserted a privilege to prevent her from testifying. The court ruled that confidential communications between the defendant and his wife were privileged and therefore inadmissible, but the wife was permitted to testify to any act she observed before or during the marriage and to any communication made in the presence of a third person. Primarily on the basis of his wife's testimony, Trammel was convicted.

9. An inappropriately argued missing witness inference may be corrected and the prejudice dispelled in certain circumstances, by the trial court promptly instructing the jury to disregard the remarks. *See Dent v. United States, supra*

■ Having concluded that it was error for the court to allow the argument, we must decide whether it constituted prejudicial error. In cases where the credibility of the defendant was crucial, the error has been held to be prejudicial. *Coombs v. United States*, D.C.App., 399 A.2d 1313, 1318 (1979); *Haynes v. United States*, D.C. App., 318 A.2d 901, 903 (1974). After a careful review of the record, we do not believe the error was prejudicial or that it "substantially swayed" the verdict. We observed earlier in Part II, that during cross-examination by the government, appellant had responded: "Gladys is not responsible for what she says or does. That's the reason I didn't put her here. She may not even understand an oath...." The jury had the opportunity to consider appellant's explanation for his wife's failure to testify. In addition, both government and defense presented numerous witnesses who testified concerning the events leading up to the homicide. Consequently, we conclude that, despite the missing witness argument, the "judgment was not substantially swayed by the error." *Kotteakos, supra* at 765, 66 S.Ct. at 1248.

### IV. *Perjury*

During closing argument, the government made the following references to several defense witnesses' testimony:

> That's suspicious testimony; isn't it? That is perjured testimony, we submit to you, ladies and gentlemen, perjured testimony...
>
> Mr. Kleinbart is trying to be his own lawyer in this case, but he has come in and he has brought in witnesses, some of whom he has found since the time Mr. Robinson testified last time, who, *we submit*, have committed perjury on the witness stand...
>
> Remember also that he put on Mr. Sheffield and Mr. Robinson. Now he conjured up those witnesses and that they lied to you.... (Emphasis added.)

Appellant contends the government's characterization of this testimony as perjury was prejudicial error. We disagree. As we have noted, appellant properly argued that the addition of "we submit" cannot cure the impropriety in such comments regarding perjury, as it is improper for counsel to give a personal opinion regarding the veracity or demeanor of witnesses. *Jenkins v. United States*, D.C.App., 374 A.2d 581, 584, *cert. denied*, 434 U.S. 894, 98 S.Ct. 274, 54 L.Ed.2d 182 (1977). However, such comments are permitted when there is a basis in the evidence for the charge. *Hyman v. United States*, D.C.App., 342 A.2d 43, 45 (1975); *cf. Stewart v. United States*, 101 U.S.App.D.C. 51, 55, 247 F.2d 42, 46 (1957) (*en banc*) (where the prosecutor's comments were held to be reversible error because of the lack of basis for them in the evidence, and, in addition, because the comments falsely intimated a personal knowledge of the witnesses' perjury).

We must consider the specific comments in issue. "Suspicious testimony" in the first quoted paragraph above refers to Mr. Sheffield's testimony regarding Ms. Teano's leaving the scene of the crime carrying a shopping bag with the butt of a shotgun sticking out. He testified, in part, as follows:

> I seen her carrying a small shopping bag, right, and the back of it, you know, a cut-off rifle or shotgun. That's how it appeared to me, that it was in there.

The government compared that to the testimony of Mr. Frazier and Ms. Teano, that she had simply crossed the street to a nearby telephone booth. Mr. Robinson, another defense witness, also testified to seeing Ms. Teano with the shopping bag and gun.

■ On the basis of our review of the record and the entire argument of the prosecutor to the jury, we are of the opinion that he was arguing on the basis of evidence in the record in conflict with that of the witnesses in question, and was not stating his personal belief or opinion. A similar

at 173; *Conyers v. United States, supra* at 312; *Pennewell v. United States*, 122 U.S.App.D.C. 332, 333, 353 F.2d 870, 871 (1965); *Smith v.*

*United States*, 119 U.S.App.D.C. 22, 23, 336 F.2d 941, 942 (1964), *cert. denied*, 385 U.S. 1017, 87 S.Ct. 736, 17 L.Ed.2d 554 (1967).

distinction is made in *Stewart, supra* at 55, 247 F.2d 42.

## V. *Bifurcation*

Appellant contends that the trial court committed reversible error by denying his motion for bifurcation. He argues that bifurcation was clearly warranted since his claim of self-defense was inconsistent with his defense of insanity. In addition, appellant contends that he was forced to withdraw his insanity defense as a result of the court's refusal to bifurcate. Finding his argument persuasive, we reverse on this issue and remand the case to the lower court for a trial on the insanity phase.

Appellant's self-defense claim was based upon his allegedly reasonable belief that, at the time of the murder, the decedent was preparing to shoot at appellant and his family. The insanity defense was based on the claim that the shooting was triggered by appellant's confused state of mind and his inability to control his behavior under stress, resulting from his mental illness.

The only evidence of, and explanation for, the court's denial of appellant's motion for bifurcation appears in the record of the following colloquy among appellant, defense counsel, and the court immediately before trial:

THE COURT: You can make an opening statement. Your defense, as I understand it is self-defense and insanity.

MR. KLEINBART: Insanity, of course, there is no question on that.

THE COURT: Is there an insanity defense or isn't there?

MR. KLEINBART: In view of your ruling, Your Honor, I would have to think about that.

THE COURT: You better. You better think about it real quick because you have doctors here, according to Mr. Robbins, who are going to attest to the fact that you were mentally ill at the time.

MR. KLEINBART: Then I would say there for the record, Your Honor, just briefly, it's my view that the two—I object to the ruling, of course, denying the bifurcation in that the two defenses con-

found each other, and it's impossible for me to put on.

THE COURT: Make up your own mind. If there is an insanity defense, you let the jury know about it. It's your business.

MR. KLEINBART: There won't be, Your Honor, if it's a unitary trial. It just can't be.

THE COURT: Mr. Robbins, I want a legal opinion from you. You are his counsel there. You have how many psychiatrists who say he was mentally ill?

MR. ROBBINS: Your Honor, there were—there have been two psychiatrists that have testified at the time that he was mentally ill. This is as a result of the psychological testing that was done.

And there was, in fact, in District Court, within the same time span, there were verdicts of not guilty by reason of insanity.

Both of the prior trials have been bifurcated. And in reviewing case law, Your Honor, while I do realize that Your Honor has ruled in this particular motion, I would have to agree with Mr.—I do agree with Mr. Kleinbart.

THE COURT: I didn't ask you whether you agree with him or not. I asked you as to what your position is.

May I suggest this: Perhaps he reserve on his opening argument until such time as the Government's case is over.

MR. ROBBINS: That, Your Honor, in view of the—

THE COURT: Well, it's going both ways. You make up your mind. That's it.

Now either he has an insanity defense —and, if it's there, it's up to you to decide. I can't force him to take it.

MR. KLEINBART: I cannot confound my defenses, Your Honor.

THE COURT: You are representing yourself. That's it. All right.

\*　　\*　　\*　　\*　　\*　　\*

THE COURT: It may change his mind. I don't know.

We will stand in recess, Mr. Robbins. I want you to talk it over very carefully because I will not bifurcate the case. It's a defense issue, and an insanity issue, and I think more closely associated than in cases where I did not do it. But, if I did do it, I was insane.

So I have ruled on it, but you make up your mind. We will stand in recess until the jury gets in. Go through the jury list, and you decide then and there. Now, if you have doctors, fine.

\*     \*     \*     \*     \*     \*

MR. ROBBINS: Your Honor, I believe Mr. Kleinbart—in Your Honor's instructions as to us conferring over the recess, I believe Mr. Kleinbart has made some decisions and wishes to address the Court in relation to it.

THE COURT: Well, I just don't want any more than just objections. I want to know what you have to say. What decisions have you made?

MR. KLEINBART: First, there will be no insanity defense because I feel that—

THE COURT: Well, let me suggest some law to you. You can protect your record by saying that you were forced to proceed by way of an insanity defense in a denial of my authority in denying you the bifurcation and you preserved it.

At this point you are sacrificing it, and I think you jeopardized yourself at the Court of Appeals to not go forward with it. I am forcing you to go forward with it. If you are convicted and go to the Court of Appeals with it—but that's it.

MR. KLEINBART: I didn't want to say that, You Honor.

THE COURT: All I want to know is: Are you going to use it now because of my ruling or not?

MR. KLEINBART: Well, because of the ruling, Your Honor, and because of self-representation and also because I felt it was the law of the case—

THE COURT: No, no, no. I just want to know whether you are going to use it or not.

MR. KLEINBART: No, sir.

\*     \*     \*     \*     \*     \*

As we have noted in a recent decision, a dual prejudice inheres in a unitary trial involving insanity: "(1) prejudice to a defendant's insanity defense arising from the evidence on the merits, and (2) prejudice to a defendant's defense on the merits arising from the insanity evidence." *Jackson v. United States*, D.C.App., 404 A.2d 911, 925 (1979). In *Jackson, supra*, we addressed a claim that the court's denial of a separate voir dire of the jury panel before the insanity phase of the trial constituted reversible error. We concluded that the court's denial effectively "negated the very purpose of granting a bifurcated trial." We stated:

The concept of bifurcated trials arose from the realization that "substantial prejudice may result from the simultaneous trial on the pleas of insanity and not guilty." *Holmes v. United States*, 124 U.S.App.D.C. 152, 363 F.2d 281, 282 (1966). The aim of a bifurcated trial is to mitigate the possibility of such prejudice by separating as much as possible the issue of mental responsibility from the factual elements of the accused's conduct. *See United States v. Taylor*, 167 U.S.App. D.C. 62, 510 F.2d 1283 (1975). The decision of whether to bifurcate rests within the sole discretion of the trial judge, and no abuse of discretion will be found in denying the bifurcation, unless the defendant proffers a "substantial claim" for the necessity thereof. *See Harris v. United States*, 377 A.2d 34 (D.C.App. 1977); *Shanahan v. United States*, 354 A.2d 524 (D.C.App.1976). [*Id.* at 926.]

We have noted that a substantial proffer both on the merits and the issue of responsibility is required. *Harris, supra* at 39. *See also United States v. Bennett*, 148 U.S.App. D.C. 364, 373, 460 F.2d 872, 881 (1972). Applying this standard to the case at bar mandates reversal. In support of his insanity defense, appellant was prepared to call two psychiatrists to testify that he was mentally ill at the time. In a recent decision of this court, addressing a claim that the trial judge erred in removing the insanity question from the jury, we stated:

In this jurisdiction, the defendant has the burden of proving insanity by a preponderance of the evidence. D.C.Code 1973, § 24–301(j). If he fails to present a prima facie case, the judge is justified in removing the issue from the jury. *See Cooper v. United States*, D.C.App., 368 A.2d 554, 559–60 (1977). To establish a prima facie case, the defendant must present sufficient evidence to show that, at the time of the criminal conduct, as a result of a mental illness or defect, he lacked substantial capacity to recognize the wrongfulness of his act or to conform his conduct to the requirements of the law. *Bethea v. United States*, D.C.App., 365 A.2d 64, 79 (1976), *cert. denied*, 433 U.S. 911, [97 S.Ct. 2979, 53 L.Ed.2d 1095] (1977). [*Pegues v. United States*, D.C. App., 415 A.2d 1374, 1377–78 (1980).]

■ With regard to his claim of self-defense, appellant put on several witnesses and testified himself. We conclude that his proffer satisfied the substantial claim requirement. Consequently, it was an abuse of discretion to deny bifurcation and we must hold that the court erred in so ruling.

## VI. *Jury Communication*

While the jury was deliberating, the foreperson sent a note to the trial judge as follows:

Judge Nunzio

In Mr. Kleinbart's testimony, did he say that when he aimed to fire the second shot, was his remark that he intended to kill him [Tyrone], because he thought he [Tyrone] was going to turn the shotgun on the car and kill everyone in the car.

Forewoman Henderson

Without notice to and in the absence of counsel and defendant, the judge responded:

It is your recollection that controls your deliberations. Please return this note to me.

Nunzio, Judge

Shortly thereafter the jury reached a verdict. Before bringing in the jury, the judge informed appellant and his standby counsel of the foregoing and no objection was voiced. However, appellant did make his objection in writing after the trial, as directed by the court.

"A defendant and his counsel have a right to be informed of all communication from a jury and to offer their reaction before the trial judge undertakes to respond." *Smith v. United States*, D.C.App., 389 A.2d 1356, 1361, *cert. denied*, 439 U.S. 1048, 99 S.Ct. 726, 58 L.Ed.2d 707 (1978) citing *Rogers v. United States*, 422 U.S. 35, 39, 95 S.Ct. 2091, 2094, 45 L.Ed.2d 1 (1975).

■ However, under the proper circumstances, "when the record shows with reasonable certainty that [the communication] did not prejudice the defendant's substantial rights," any error in this regard will be held harmless. *Walker v. United States*, 116 U.S.App.D.C. 221, 222, 322 F.2d 434, 435 (1963), *cert. denied*, 375 U.S. 967, 84 S.Ct. 494, 11 L.Ed.2d 421 (1964). *Accord, Calaway v. United States*, D.C.App., 408 A.2d 1220, 1229–30 (1979).

In *United States v. Arriagada*, 451 F.2d 487 (4th Cir. 1971), *cert. denied*, 405 U.S. 1018, 92 S.Ct. 1300, 31 L.Ed.2d 481 (1972), the trial court's answer was simply a reiteration of the prior jury charge and no objection was raised until after the verdict was returned. The Fourth Circuit held that the communication was harmless error. To constitute harmless error, the error must "not touch the substance of the standards by which guilt is determined . . . ." *Bollenbach v. United States*, 326 U.S. 607, 615, 66 S.Ct. 402, 406, 90 L.Ed. 350 (1946).

In *Roberts v. United States*, D.C.App., 402 A.2d 441, 443–44 (1979), we found the court's response to the jury was inadequate, confusing, and ambiguous, and appellant had objected before the announcement of the verdict. We held, on the facts, that the error was prejudicial, and remanded for a new trial.

■ In the instant case, the communication appears to be an impartial and nonprejudicial response from the court. Appellant argues that he was prejudiced because he was denied an opportunity to argue that

the testimony should be re-read. Even if the note had unequivocally requested a re-reading of appellant's trial testimony, that decision lies "almost exclusively" within the discretion of the trial court. *United States v. Mackin*, 163 U.S.App.D.C. 427, 440, 502 F.2d 429, *cert. denied*, 419 U.S. 1052, 95 S.Ct. 629, 42 L.Ed.2d 647 (1974); *United States v. Ballard*, 535 F.2d 400, 407 (8th Cir. 1976). The problem, of course, in re-reading a portion of testimony is in placing undue emphasis on that evidence (*United States v. DePalma*, 414 F.2d 394, 396 (9th Cir. 1969), *cert. denied*, 396 U.S. 1046, 90 S.Ct. 697, 24 L.Ed.2d 690 (1970)), or in highlighting certain testimony especially where, as here, it related to a crucial issue.

We find that the court's communication with the jury under these circumstances did not amount to reversible error.

VII. *Interstate Agreement on Detainers*

Appellant contends that the trial court erred in failing to dismiss the indictment for violation of the Interstate Agreement on Detainers (IAD). D.C.Code 1973, §§ 24–701 *et seq.* We conclude the IAD was not applicable in this case.

On February 5, 1976, appellant remained incarcerated in the District of Columbia Jail following the mistrial; a retrial was scheduled for April 26th. Appellant had previously been convicted of a series of federal offenses in the United States District Court on December 27, 1975. He was sentenced on February 12, 1976, and transferred first to Lorton Reformatory and then to the United States Penitentiary in Atlanta, Georgia.[10]

On April 16, 1976, appellant was returned to the District of Columbia for consultation with defense counsel and for trial pursuant to a writ of habeas corpus *ad prosequendum* issued by the Superior Court.[11]

On August 27, 1976, after appellant's indictment in Prince George's County, Maryland, he was taken there for mental evaluation pursuant to a writ of habeas corpus *ad prosequendum* issued by a Maryland court. He was returned to Lorton and remained in custody there until he was returned to Maryland on October 22, for a motion hearing pursuant to a writ of habeas corpus *ad prosequendum* issued by the same Maryland court. Appellant was scheduled to return to Lorton but remained in Maryland pursuant to another writ of habeas corpus *ad prosequendum* until October 27th.

■ Appellant filed a pretrial motion to dismiss the indictment in this case contending that the government, in allowing him to be taken to Maryland prior to the disposition of his case in the District of Columbia, had violated the IAD.[12] The motion to dismiss was renewed prior to the commencement of trial and was denied without a hearing.

■ The record does not indicate that a detainer had been lodged in connection with the District of Columbia charges.[13] It is settled that a writ of habeas corpus *ad prosequendum* is not a detainer within the

---

**10.** Appellant contends that during his confinement in the D.C. Jail prior to his first trial, a detainer was filed against him "for the instant offense." The government disputed this and was prepared to show that the records of the D.C. Jail indicate that the only detainers lodged against appellant were filed by Prince George's County, Maryland, and that no other detainers were lodged against him while he was incarcerated at the jail. The government counters with the same argument in respect to appellant's claim that while he was incarcerated at the federal prison in Atlanta, a detainer was filed against him "with regard to the instant offense."

**11.** The authority of the Superior Court to issue a writ of habeas corpus *ad prosequendum* was upheld by this court in *United States v. Palmer*,

D.C.App., 393 A.2d 143 (1978). *See United States v. Cogdell*, 190 U.S.App.D.C. 185, 585 F.2d 1130 (1978).

**12.** The primary purpose of the IAD is to eliminate abuses such as delay in bringing prisoners to trial and interference with rehabilitation programs, which characterized the use of "detainers" prior to the adoption of the Agreement. It is also designed to establish a uniform process for transporting prisoners for trial from a jurisdiction in which they are serving a sentence to a jurisdiction in which they have been charged with an offense. *Vance v. United States, supra, quoting United States v. Cogdell, supra.*

**13.** *See note 10, supra.*

meaning of the IAD. *United States v. Mauro*, 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978), *rev'g*, 544 F.2d 588 (2d Cir. 1976); *Vance v. United States*, D.C. App., 399 A.2d 52 (1979); *United States v. Palmer, supra* note 11; *Gale v. United States*, D.C.App., 391 A.2d 230 (1978); *cert. denied*, 439 U.S. 1133 (1979); *United States v. Cogdell, supra* note 11.

■ The government argues that the IAD did not apply or in the alternative, if it did apply, appellant's transfer to Maryland had no impact on the prosecution of this case. Because we agree with the government's first argument, we do not reach the second. The IAD was not implicated by appellant's (1) return to the District of Columbia, (2) transfer to Maryland on August 27, 1976, (3) return to D.C., (4) transfer to Maryland on October 22, and (5) final return to D.C. on October 27th. Each transfer was effected by a writ of habeas corpus *ad prosequendum*. Consequently, the IAD does not apply to appellant's movements to and from the District of Columbia and Maryland.[14] The IAD is not the exclusive means of effecting the transfer of prisoners between jurisdictions. *United States v. Mauro, supra.*

## VIII. *Uncommunicated Threats*

■ Appellant cites error in the trial court's exclusion of evidence of the decedent's threats against him, communicated only to a third party. He claims that such testimony was necessary to demonstrate Bennett's state of mind regarding appellant in support of his assertion of self-defense.[15] The rule adopted in the District of Columbia is as follows:

> When a defendant claims self-defense and there is substantial evidence, though it be only his own testimony, that the deceased attacked him, evidence of un-

communicated threats of the deceased against the defendant is admissible. [*Griffin v. United States*, 87 U.S.App.D.C. 172, 174, 183 F.2d 990, 992 (1950).]

In *Evans v. United States*, 107 U.S.App. D.C. 324, 277 F.2d 354 (1960), a murder conviction was reversed because evidence of the deceased's "character and belligerancy," although unknown to the defendant, was excluded. The court found that the testimony was admissible to "corroborate . . . the defendant's testimony that the deceased was the aggressor," as a logical extension of the rule in *Griffin v. United States, supra*. The court also recognized the admissibility of evidence of specific acts of violence as well as a general reputation for cruelty and violence in support of a self-defense theory, all of which were permitted in the case at bar. Where our case differs, however, is in the requirement for substantial evidence that the deceased was the attacker. The defendant in *Evans* testified that the deceased had grabbed her, ripping her clothing, after she had repelled his sexual assault. We have no such substantial evidence present in this case to permit the introduction of the uncommunicated threats under the rule of *Griffin*. Appellant testified that the deceased reached toward his side or turned slightly, but no attack directly followed this movement. Appellant testified that the deceased then ran toward the parked car, demanding a shotgun, but that was only after appellant had fired his first shot. We cannot find that the deceased, regardless of his reputation for violence, was the first attacker before or after appellant fired his gun in the decedent's direction. Finding no substantial evidence, as required under *Griffin*, we hold that the trial court's ruling of inadmissibility regarding the testimony of a third party of uncommunicated threats was proper.

14. *See*, for an extended discussion of the application of the IAD, *United States v. Mauro, supra*; *Vance v. United States, supra*; *United States v. Palmer, supra*.

15. However, even assuming error in the exclusion of such uncommunicated threats, we fail to find any prejudice because the testimony

was cumulative. The jury heard testimony from two witnesses regarding threats which were related back to appellant and amply demonstrated Bennett's state of mind. The erroneous exclusion of a sole witness's testimony of one more threat, uncommunicated to appellant, would amount to harmless error in any event.

## IX. *Transcript*

Appellant filed numerous motions requesting a transcript of his earlier trial, but received only the portion relating to the government's case. He claims now that the court's failure to provide him with a complete transcript including the earlier defense proceedings was a constitutional error which deprived him of presenting an adequate defense. In *Griffin v. Illinois*, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956), the Court established the principle that the State must, as a matter of equal protection, provide some means of affording indigent defendants an adequate and effective review on appeal, when such tools are otherwise available to other defendants for a price. The Court specifically refused to hold, however, that a stenographer's transcript must be purchased in every case in which a defendant cannot afford to buy one. *Id.* at 20, 76 S.Ct. at 591. In later applying this principle, *Britt v. North Carolina*, 404 U.S. 226, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971), the Court delineated circumstances in which a transcript was required for an effective defense or appeal:

> In prior cases involving an indigent defendant's claim of right to a free transcript, this Court has identified two factors that are relevant to the determination of need: (1) the value of the transcript to the defendant in connection with the appeal or trial for which it is sought, and (2) the availability of alternative devices that would fulfill the same functions as a transcript. [*Id.* at 227, 92 S.Ct. at 433.]

There, the petitioner conceded that he had available an informal alternative, substantially equivalent to the transcript itself, in that the court reporter from the first trial had offered to read back his notes before the second trial, if so requested. Counsel and the judge were the same for the second trial, which occurred approximately one month after the first. In these circumstances, the court suggested that petitioner's memory and that of his counsel should have furnished an adequate substitute for a transcript. *Id.* at 228, 92 S.Ct. at 434.

The "value" of the transcript is in insuring adequate cross-examination and impeachment materials during a second trial. *United States v. Baker*, 523 F.2d 741 (5th Cir. 1975). In *Baker, supra* at 742, the Fifth Circuit concluded that it was error to deny the defendant a copy of the complete transcript of the first trial before the beginning of the second trial, where the defendant at the first (which ended in a mistrial) was not represented by the same counsel, and the two trials were separated by a period of six months.

■ After applying the above factors to the case at bar, we conclude that the value of the defense portions of the transcript was minimal. Appellant had his cross-examination and impeachment materials in the transcript of the government's case from the first trial. In addition, only five of the 16 defense witnesses whom appellant called to the stand during the second trial had testified at the first trial.[16] Although the second trial followed almost a year later, appellant was afforded an opportunity prior to the second trial to interview two of the five defense witnesses who had testified at the first trial and to interview the others before they testified. Accordingly, we find that appellant was not hindered in presenting an effective and adequate defense during his second trial merely because he lacked a complete transcript of the defense case in the first trial.

## X. *Prior Statements*

■ There are three instances in which the trial court ruled testimony by witnesses relating to prior statements by appellant inadmissible because of their self-serving nature.[17] The statements were made by

---

**16.** One of those witnesses also testified for the government during the first trial and appellant *had a transcript* of this testimony.

**17.** We are not unmindful of the pragmatic approach adopted by the Seventh Circuit in *Unit-* *ed States v. Dellinger*, 472 F.2d 340 (1972), whereby the "flat rule" against self-serving declarations was replaced by an analysis which focused on the relevance and reliability of the declaration. *Id.* at 381–82.

appellant between the time of the assault by the deceased on appellant's wife and the shooting incident. Appellant argues that the statements were admissible to show his state of mind at that time. The question objected to was as follows:

> Q: [Mr. Kleinbart] Now when we discussed this incident, ma'am [Johnsie Sturdivant], what did I say to you?

Although the objection was sustained, later the following testimony was advanced:

> Q: What if anything occurred then?
>
> *   *   *   *   *   *
>
> The Witness: The conversation we had, you said you wanted to see him [Bennett]. You didn't want no trouble. You wanted to find out why he smacked your wife.

Apparently this was the state of mind which appellant desired to bring before the jury. Thus, he would have argued that he was not looking for trouble and was therefore not the aggressor in the situation. The other possibility, which is more likely, is that appellant sought to introduce evidence that his state of mind toward the deceased, prior to the shooting, was one of fear and therefore it was unlikely that he was the aggressor. There are problems with either argument. It is undisputed by appellant that he fired the first shot at the deceased, although he claims that he purposely aimed over the victim's head. He argues, however, that he shot the victim in self-defense, intending to hit him with the second shot he fired. The pertinent inquiry, then, is appellant's state of mind immediately prior to the actual killing, or the time period between the two shots which were fired. Even if we accept appellant's proposition that he was not the aggressor, the question which was before the jury was whether appellant acted reasonably in his killing Bennett in so-called self-defense. The standard to be applied is an objective one, and appellant's state of mind several days prior to the actual confrontation is irrelevant. We therefore find that the self-serving hearsay statements were properly excluded on the basis of irrelevance.

■ Appellant has misperceived the state of mind exception to the hearsay rule, which permits admission of extrajudicial statements that reflect the declarant's state of mind when such is an issue in the case. The initial inquiry is one of "relative relevance," requiring a balancing of the need for such evidence against the danger of prejudice. *Rink v. United States*, D.C.App., 388 A.2d 52, 57 (1978); *United States v. Brown*, 160 U.S.App.D.C. 190, 194, 490 F.2d 758, 762 (1973) (as amended in 1974); *See Campbell v. United States*, D.C.App., 391 A.2d 283, 287 (1978). We need not go so far in this case as to balance, since we find there was no manifest need for evidence that was unrelated to a material issue in the case.

## XI. *Impeachable Convictions*

Appellant contends that the trial court erred in failing to order disclosure of the criminal records of the government's witnesses upon appellant's specific request for such information in August, 1976. The government counters: (1) that the impeachable convictions were equally accessible to appellant and, (2) that, in any event, there is no reasonable possibility that the disclosure would have affected the jury's verdict.

■ Without deciding the question regarding appellant's right to subpoena impeachable convictions of government witnesses prior to trial, we find that the government does have an obligation to make such convictions available at trial upon request, as a matter of due process under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Tabron v. United States*, D.C.App., 410 A.2d 209 (1979); *Lewis v. United States*, D.C.App., 393 A.2d 109 (1978); *aff'd on rehearing*, 408 A.2d 303 (1979). Accordingly, we hold it was error for the government to fail to provide this information to appellant at trial. The question remains, however, whether this constitutes "suppression" of these records by the prosecution warranting sanctions by the trial court. In *Lewis, supra* at 116–17, we stated:

> If all impeachable convictions of [the prosecution's] witnesses ... known to the

government, were contained in the Criminal Information Center, and thus were readily available to defense counsel without legal process—then there was no "suppression" of *Brady* material.

\* \* \* \* \* \*

If, however, the government had prior conviction records (accessible to the prosecutor) which were not accessible to defendant counsel at the Criminal Information Center and were not disclosed at trial after this *Brady* request, then this evidence was "suppressed." (Citations omitted.)

Although the government is not obliged to investigate for such criminal records of its witnesses, its "knowledge" is not limited to the personal knowledge of the prosecutor, but includes all records to which it has access. *Id.* at 116. Because we cannot ascertain from the record whether the government has or has not "suppressed" any such information regarding impeachable convictions, we find it necessary to remand for a hearing by the trial court according to the procedure set forth in *Lewis v. United States, supra.* The trial court should inquire whether the prosecutor had access to impeachable convictions of its witnesses which were not available to the defense through the Criminal Information Center.[18] If the answer is affirmative, and the trial court concludes that the suppressed evidence might have affected the outcome of appellant's trial, then the court shall order a new trial. Otherwise, the convictions shall stand, subject to further appeal to this court. *Id.* at 118.

## XII. *Brady Hearing*

A witness to the crime, Ms. Allen, gave a statement to the police (in another case) in which she said that after the shooting she ran over to the deceased's body, took a gun from it, and fled. Subsequently, Ms. Allen told a Public Defender Service attorney that the police pressured her into giving the statement by showing her statements of *other witnesses* saying that she had taken the gun, which forced her to admit some involvement in the incident. Ms. Allen told the PDS attorney that the police statement was false, except for the part about her taking the gun from Bennett's body.

Appellant requested that the government produce the statements of the other witnesses which the police had shown Ms. Allen. Since his defense was self-defense, such statements obviously would be *Brady* material. The government replied that no other statements existed.

Appellant made a pretrial motion for a hearing in order that the court would be able to determine whether such statements existed. The court summarily dismissed the request, stating: "If there is *Brady* material the Government is under an obligation to give it to you. That's it.... So, if it's *Brady*, he is giving it to you. That's it. No hearing."

█ The principle of *Brady* is that government suppression of evidence favorable to the accused violates due process when that evidence is material to guilt, irrespective of good or bad faith by the government in its denial of the defendant's request. The test of materiality, in the face of appellant's claim of self-defense, is clearly met here. The government simply counters that Ms. Allen is an unreliable witness. However, the trial court had the obligation to conduct an inquiry as to the possible existence of other statements beyond the blanket denial of the prosecutor.

In an analogous situation involving the Jencks Act (18 U.S.C. 3500) material, this court stated:

When a defendant seeks production of a statement under the Jencks Act, the trial court has an affirmative duty to determine whether any such statement exists and to conduct such inquiry as may be necessary to resolve the issue.... The fact that the prosecutor does not admit the existence of a statement does not relieve the court of its duty to determine whether the statement in fact ex-

---

**18.** It is enough that the information was simply available to the defense, whether or not he was able to get to the Center because he was incarcerated.

ists.... [*Williams v. United States*, D.C. App., 355 A.2d 784, 788 (1976) (citations omitted).]

We therefore remand for a hearing to determine whether exculpatory material existed and was suppressed in violation of *Brady*. If such material did exist, the appellant must be granted a new trial.

Accordingly, the case is remanded to the trial court for the purposes of (1) conducting a hearing concerning the existence of statements of witnesses which constitute *Brady* material; (2) a hearing to determine whether the government withheld information of any impeachable conviction of its witness that was not otherwise available to the defense.

If neither hearing develops information which the trial court feels compels a setting aside of the verdict of guilty, then the court shall conduct the second half of the bifurcated trial to determine whether the appellant shall be adjudged not guilty by reason of insanity.

*So Ordered.*